[No. 28386. Department One. October 30, 1941.]

MARCUS NALLEY et al., *Respondents,* v. FRED HANSON et al., *Appellants.*[1]

[1]Reported in 118 P. (2d) 435.

*J. W. Graham,* for appellants.

*Charles R. Lewis* and *Henderson, Carnahan & Thompson,* for respondents.

STEINERT, J.—Plaintiffs brought suit for the cancellation of a tax deed which had been executed by the county treasurer of Mason county pursuant to a judgment of foreclosure of liens for general taxes levied on the real estate described in the deed, and to quiet title to the property in the plaintiffs. The action was tried to the court without a jury. The court made no formal findings of fact but, upon the evidence, entered a judgment canceling the deed and directing that the sum of one hundred fifty dollars, which plaintiffs had theretofore deposited in the registry of the court, be paid to defendants to reimburse them for their expenditures in acquiring the property through the tax foreclosure, for interest, and for costs. Defendants have appealed.

Appellants assign as error (1) the overruling of their demurrer to the complaint, (2) the denial of their motion to dismiss the action made at the close of respondent plaintiffs' case, and (3) the entry of judgment in favor of the latter. The sole question presented by these assignments is whether or not, under the facts as alleged in the complaint or as shown by the evidence adduced, the court was warranted in setting aside the tax deed in question.

Summarizing the allegations of the complaint, we state the facts therein set forth, as follows: Respondents, husband and wife, have at all times subsequent to August 14, 1937, been the owners of two parcels of real estate in Mason county, Washington, described as:

"Tract two (2) of Lot one (1) of Section Twelve (12) and Tract six (6) (being the East half of the West

half of the Southeast quarter of the Southeast quarter) of Section one (1) in Township twenty-one (21) North, Range four (4) W.W.M."

formerly comprised in the Skokomish Indian reservation in that county. Respondents were also the owners of a considerable number of other tracts of land contiguous to, or in the immediate vicinity of, the land above described, all situated within the former boundaries of the Indian reservation.

On or shortly before March 1, 1939, respondent Marcus Nalley, to whom we shall hereinafter refer as though he were the sole respondent, called at the office of the county treasurer of Mason county for the purpose of paying all outstanding general taxes upon his real estate holdings referred to above. His business there was transacted with a woman who was then the deputy county treasurer.

Respondent had brought with him, on that occasion, a map or plat of the Indian reservation, which showed all the real estate in which he was then interested, including the two tracts specifically described above. He advised the deputy of the purpose of his call, exhibited to her the map in his possession, marked a red letter "N" upon each of the tracts with which he was concerned, including tracts two and six, and told the deputy that he desired to pay all taxes, both current and delinquent, upon all the tracts so marked and identified. The tax statements had not been prepared at that time, however, and the deputy thereupon promised and agreed that she would, prior to March 15, 1939, cause to be prepared and mailed to respondent tax statements on all of the tracts so identified, including tracts two and six. The deputy further stated to respondent at that time that she had in her possession a duplicate of the map exhibited to her by him, and that it was therefore unnecessary for him to

leave his copy with her. She did, however, make a written memorandum of the tracts, including tracts two and six, which respondent had identified in the manner above described. With that understanding of what was to be done, respondent left the treasurer's office and returned to his home in Tacoma.

A few days later, respondent received from the office of the county treasurer a list of tax statements showing all taxes, both delinquent and current, imposed upon a great number of parcels of real estate within the former boundaries of the Skokomish Indian reservation. However, there was not included in that list any statement of taxes levied against tracts two and six. Respondent, relying on the promise and agreement of the deputy, assumed and believed that there was included in the list of statements so transmitted a statement covering the taxes on the two last mentioned tracts. Acting on that belief, he paid all the taxes shown by the statements which he had received, thinking that he had thus likewise paid the taxes on the two tracts here involved.

Thereafter, without the knowledge of respondent, Mason county instituted and prosecuted to judgment an action to foreclose the county's liens for taxes levied against tracts two and six. Pursuant to the judgment in that action, the property was sold to appellant Fred Hanson on October 14, 1939, and two days later the county treasurer issued to him the tax deed which is here sought to be canceled. For this property, Hanson paid the sum of $129.16.

About December 1, 1939, appellants Fred Hanson and Jeanette Hanson, husband and wife, conveyed the two tracts to their son, appellant Buster F. Hanson, who later paid the general taxes thereon for 1940. The total amount paid out by the appellants for and on account of the property was $137.

Respondent did not learn of the tax foreclosure and sale until March 1940, when he was notified by appellant Fred Hanson that such tax sale had been held and that he had bought the two tracts. Respondent thereupon immediately called on appellants and offered to pay the amount expended by them for and upon the property, together with reasonable interest thereon. Appellants, however, refused to accept the offer, and stated that they would not convey the property to respondent for any sum less than one thousand dollars. Shortly thereafter, respondents instituted this action, offering in their complaint to pay appellants all sums expended by them in payment for the land and all other necessary expenses incurred by them in connection therewith.

The only witnesses who testified with reference to the material facts in the case were respondent Marcus Nalley and the deputy treasurer referred to above. Nalley not only reiterated and reaffirmed every allegation made in the complaint, but testified in detail concerning the transaction between himself and the deputy.

His testimony was in substance as follows: Prior to his going to the county treasurer's office on March 1, 1939, he had not received any current tax statements. For two years he had been required to call at the courthouse for such statements because the county did not have the money with which to defray the expense of mailing them, and he had heard rumors that no statements for the current year would be sent out. Accordingly, on the date last mentioned, he went to the county treasurer's office for the purpose of paying the taxes, current and delinquent, on the properties then owned by him. He was not familiar with legal descriptions and therefore had procured a map upon which, in the presence of the deputy treasurer, he

designated in red pencil the particular tracts of land upon which he desired then and there to pay the taxes, intending thus to procure the usual discount. He also had with him a list of the names of property owners, and he told the deputy that he desired to pay the taxes on the property thus designated. He was prepared to pay the full amount of all the taxes by check, and no objection was, or has been, made against that medium of payment.

The deputy informed him that the statements were not ready and that it would require some time to make them out. Being busy at the time, the deputy inquired of respondent whether it would be satisfactory if she mailed the statements to him later. Although respondent was prepared and willing to pay his taxes at once, and was in no hurry to get away on that particular occasion, he acceded to the suggestion made by the deputy and stated that it would be all right if she mailed the statements later, provided he received them in time to pay the taxes on the required date. He thereupon offered to leave his map with the deputy, but she informed him that she had a duplicate copy of it. He also offered to leave with her the list of names which he had written down, and, according to his recollection, the deputy either took the list or else made a copy of it for her own use.

Included in the list of names thus submitted by respondent was that of S. R. Bunten as one of the owners of the property on which the taxes were sought to be paid. Bunten was at that time the *record* owner of tracts two and six, the property here involved, although he had previously executed and delivered to respondent a warranty deed thereto. Nalley had sent the deed to an attorney with instruction that it be recorded. Through some oversight on the part of

some one in the attorney's office, however, the deed had not been filed for record.

When the statements were finally sent to respondent, he did not fully examine them, for the reason that he did not understand them and, further, because he relied upon the promise of the deputy to send statements which would show the amount of taxes owing on all the properties. He therefore sent a check in full payment of the amount as shown by the statements, thinking that he had thereby paid the taxes on all the properties in which he was interested, including tracts two and six.

Respondent did not learn of the mistake until almost a year later, when he was informed by a third person that tracts two and six had been sold for taxes. It appears that the only road leading to these two tracts is one over a dike which respondents have built on their own property.

When Nalley learned the true situation, he communicated with appellants and offered to reimburse them for all the money which the latter had paid for and on account of the land, together with interest, and in addition offered to pay them a bonus of two hundred dollars, but appellants declined to accept anything less than one thousand dollars. Respondents thereupon brought this action and subsequently paid into the registry of the court the sum of one hundred fifty dollars, which the court found to be more than sufficient to reimburse appellants for all moneys expended by them, with interest and costs.

The deputy treasurer admitted in her testimony that respondent Marcus Nalley had called at the office for the purpose of paying his taxes, and that he had with him at the time a map which had "some little 'X's' on it here and there." She could not remember whether or not the map concerning which Nalley had testified

was the one which he originally exhibited to her, but she did not think that it was. She further testified that she did not take down any list of names of property owners, but she could not remember whether or not Nalley had left the list with her.

Her version of the affair was that tax statements had previously been sent to Nalley, but that he had failed to bring them with him on the occasion in question; that she had no means of checking the descriptions on the map which was exhibited by him, except by going to the assessor's office, and that Nalley refused to take the time to have that done; that Nalley then told her to send him the statements as shown by the county treasurer's office record of ownership; that Nalley gave her no memorandum showing the name of Bunten, or the names of several other individuals included in the list referred to in Nalley's testimony; that, after making an attempt, on the occasion of his call, to reconcile the descriptions on Nalley's ownership cards, as they appeared in the treasurer's office, with the marks on the map which Nalley then had with him, it was agreed that she would send him statements of the taxes on all properties which stood in his name, and that such statements were sent. She did not recall that Nalley had directed her attention to the fact that he had any interest in the two tracts here involved. She further testified that, shortly before the commencement of this action, she had a conversation with Nalley and that he then stated to her that he had not checked the statements before paying them nor had he checked the receipts which were later returned to him.

 Appellants rest their contention upon that portion of Rem. Rev. Stat., § 11288 [P. C. § 6882-127], which provides:

"And any judgment for the deed to real property sold for delinquent taxes rendered after the passage

of this act, except as otherwise provided in this section, shall estop all parties from raising any objections thereto, or to a tax title based thereon, which existed at or before the rendition of such judgment, and could have been presented as a defense to the application for such judgment in the court wherein the same was rendered, and as to all such questions the judgment itself shall be conclusive evidence of its regularity and validity in all collateral proceedings, except in cases where the tax has been paid, or the real property was not liable to the tax."

Since, in this instance, the property involved was liable for the tax, and the tax was not paid, and since respondents' objections to the regularity and validity of the judgment and of the tax sale based thereon existed prior to the rendition of the judgment of foreclosure, it might appear necessarily to follow that, according to the terms of the statute, the judgment operated to estop all persons, including respondents, from raising any objections to either the judgment or the tax title acquired by appellants. However, the legal principle which this court has consistently followed in just such cases as this is that an effort made in good faith by the property owner to pay his taxes is equivalent to payment, to the extent that it will discharge the lien of the tax and bar a sale for non-payment thereof. *Schultz v. Kolb*, 189 Wash. 187, 64 P. (2d) 79. In that case, we assembled our prior decisions announcing the principle just stated, and said:

"An examination of each of the cases just cited will reveal either (1) that the complaint made a clear case for relief upon the principle referred to, sufficient to withstand a demurrer; or (2) that the evidence clearly showed either that the taxes had been paid or that an actual *bona fide* attempt had been made to pay them; or (3) that the treasurer had, by some immediate and direct act of his own, prevented the prop-

erty owner from paying the tax, which otherwise he would have done."

From the opinion in that case, it is to be noted that in such actions: (1) When the question is to be decided upon the complaint and demurrer, the complaint must make a *clear* case for relief; (2) when the case is tried on its merits, the evidence of a *bona fide* attempt to pay the tax must be clear, cogent, and convincing; and (3) any immediate and direct act of the treasurer which prevents the property owner from paying the tax may, likewise, be a ground for relief.

The matter before us thus narrows itself to the inquiry whether or not respondent established by clear, cogent, and convincing evidence that he had made a *bona fide* effort to pay his taxes, or, in the alternative, whether or not the deputy treasurer, by some immediate and direct act of her own, prevented respondent from paying the taxes. If respondent did make such effort, or if the deputy did commit such an act, then that effort or that act discharged the lien of the tax, and, as a consequence, there was no basis in law for the tax sale, and none to support the validity of a tax title in appellants. If both elements just mentioned are present, there would be still greater reason for the same result.

If the testimony of Marcus Nalley is to be believed, there can be no doubt that he made a *bona fide* effort on March 1, 1939, to pay the taxes on all of his property, including the two tracts here involved. He went to the county treasurer's office for that purpose; he designated on a map and by a list of names the property on which he then desired to pay the amounts due and owing; and he was then prepared financially to make the payment. He had the right to pay his taxes then and there. It was not his fault that the

tax was not paid at that time. His failure to make immediate payment was brought about by conditions in the treasurer's office over which he had no control. The county treasurer had not yet prepared the tax statements, and the deputy was too busy to prepare them on that day. It was the direct and immediate act of the deputy that prevented payment at that time.

If the deputy had on that occasion told Nalley the amount of the taxes due and owing on the properties designated by him, and if Nalley had then paid that amount, even though by mistake of the deputy certain of the property was not then included, such payment would have been sufficient at least to discharge the lien upon the property and to invalidate any subsequent tax sale for nonpayment. The situation here, though somewhat different from that in the illustration just employed, amounts to the same thing. Nalley was still in the position of one who was ready, able, and willing to pay the taxes on certain designated properties, awaiting only to be informed of the exact amount, as had been agreed. The deputy undertook to inform him of that amount, and on receipt of the information Nalley in good faith paid what was represented to him to be due.

It may be conceded that the deputy had no intention to misrepresent matters to respondent. It may also be conceded that, if Nalley had carefully checked the statements received by him, he might have discovered the error, although in our opinion that is doubtful, owing to the complex nature of the legal descriptions of the property and his lack of knowledge concerning such matters. However, if he can be at all charged with neglect in that respect, his mistake, or rather the mistake of the deputy, was one

which, in our opinion, Nalley would not, under the circumstances, have discovered by the exercise of ordinary prudence. As stated in *Puget Sound Nat. Bank v. Biswanger*, 59 Wash. 134, 109 Pac. 327:

"It is not the policy of the law that the owner should lose his land through excusable mistake; and while it may not be said that there was any negligence on the part of the treasurer in this case, the fact remains that an honest attempt had been made on the part of the owners to pay the taxes, and that the mistake was one which the exercise of ordinary prudence would not detect." .

So, in the case at bar, the fact remains that respondent made an honest attempt to pay the taxes and was prevented from so doing, at the time, by the direct and immediate acts of the deputy.

We are mindful of the rule, frequently stated by this court, that the evidence of any claimed invalidity of a tax foreclosure judgment or of any title based thereon must be clear, cogent, and convincing. *Schultz v. Kolb, supra.* We affirm that rule again. However, while the evidence in this case upon the material facts involved was adduced through the testimony of but two witnesses, Nalley and the deputy treasurer, it was all the evidence which the circumstances of the case would permit, for Nalley and the deputy treasurer were the only persons involved in the transaction. Moreover, the rule with reference to the character of evidence required is one for the guidance of the trier of the fact, and undoubtedly the trial judge was well acquainted with so familiar a rule, for in his memorandum opinion he stated that respondents were entitled to relief upon the facts, under the rule announced in the *Schultz* case.

From our examination of Nalley's testimony as it appears in the statement of facts, we find it to be

definite, clear, and cogent, and, manifestly, it convinced the trial court.

The judgment is affirmed.

ROBINSON, C. J., MAIN, MILLARD, and DRIVER, JJ., concur.

[1]Reported in 118 P. (2d) 421.