[No. 30061. Department One. March 27, 1947.]

PIERCE COUNTY, *Respondent,* v. CHARLOTTE NEWBEGIN *et al., Defendants,* FRANK KROPI, *Appellant,* NORMAN G. JACOBSON, *et al., Respondents.*

FRANK KROPI, *Appellant,* v. NORMAN G. JACOBSON *et al., Respondents.*[1]

[1]Reported in 178 P. (2d) 742.

*Peterson & Duncan,* for appellant.

*Grosscup, Ambler & Stephan, Thor C. Tollefson, Theo. L. DeBord,* and *Hardyn B. Soule,* for respondents.

*Gagliardi, Ursich & Gagliardi, amicus curiae.*

MALLERY, C. J.—Causes Nos. 3030 and 90773 (Pierce county) are consolidated here upon appeal.

On February 21, 1942, Frank Kropi traded some machinery that he valued at twenty-five hundred dollars to George Savage for the tract of land here in question and received a quitclaim deed, which he failed to record. The deed conveyed the land subject to taxes. On March 10, 1942, he was inducted into the armed forces of the United States. Prior to his departure, he left money and the deed with his uncle Rudy Kropi, who was to pay the taxes and take care of some other personal matters.

The following May, George Savage, who worked in the same mine with Rudy Kropi, planned to go to Tacoma to pay his taxes. Rudy Kropi arranged with him to also pay the taxes on the land here in question, and gave him the deed from which he was to get the legal description. Accordingly, Savage went to the county treasurer's office, handed the deed to a deputy, asked for a statement in order to pay all of the taxes due, and forthwith paid the amount shown, taking the statement as his receipt. He did not know of any taxes due other than as shown on the tax statement prepared for him. However, it was for the current year's taxes only. The deputy wrote the letters "B. T." in one corner of the tax statement, but did not say anything about the delinquent taxes for preceding years or explain the significance of that notation. The use of the letters "B. T." purported to be the treasurer's way of complying with Rem. Rev. Stat., § 11246 [P.P.C. § 979-217], which provides

" . . . that in issuing a receipt for such current tax the county treasurer shall endorse upon the face of such receipt a memorandum of all delinquent taxes against the property therein described, showing the year for which said tax is delinquent and the amount of delinquent tax for each and every year. . . ."

The following year, 1943, Rudy Kropi told Savage he had received no tax statement for Frank Kropi's property and asked him to check when he was at the treasurer's office. When Savage went to pay his own taxes, he inquired and then for the first time discovered that the property had been sold for taxes. The defendants Jacobson bought the property at the tax foreclosure sale for $70.93.

After his discharge from the armed forces of the United States, Frank Kropi recorded his deed, tendered eighty dollars to the Jacobsons, who refused it and refused to relinquish the property, and then filed his petition herein to set the tax foreclosure decree, sale, and deed aside. He paid the eighty dollars tender into the registry of the court. From an order of dismissal, petitioner appeals.

The case nearest in point in this state is *Nalley v. Hanson,* 11 Wn. (2d) 76, 118 P. (2d) 435. In that case, it appeared that Nalley, the plaintiff in the lower court, owned numerous parcels of land in Mason county, including tracts two and six, the title of which was in question. On March 1, 1939, Nalley called at the treasurer's office with a map showing all the land he owned in the county, including tracts two and six, and advised the deputy treasurer that he desired to pay all the taxes on his property. As the tax statements had not been prepared, the deputy promised Nalley she would prepare all the statements and send them to him. With that understanding, Nalley returned to Tacoma, where, a few days later, he received a number of tax statements. These statements included all his property within the county except tracts two and six. Nalley did not examine the statements and paid all the taxes indicated by the statements, not knowing, however, that he was omitting to pay taxes current and delinquent on tracts two and six. Thereafter, without the knowledge of Nalley, Mason county instituted and prosecuted to judgment a tax foreclosure action and, on October 14, 1939, sold tracts two and six to Hanson for $129.16. Thereafter, Hanson conveyed the property to his son. In March, 1940, Nalley learned of the tax foreclosure and sale for the first time. He immediately offered to pay Hanson the amount Hanson had paid for the

property together with interest. This offer was refused, whereupon an action was instituted. At all times therein mentioned, the record title to tracts two and six stood in the name of Bunten. Bunten had previously deeded the property to Nalley. However, Nalley had never recorded this deed.

We quote from the opinion:

"From the opinion in that case [*Schultz v. Kolb,* 189 Wash. 187, 64 P. (2d) 79], it is to be noted that in such actions: (1) When the question is to be decided upon the complaint and demurrer, the complaint must make a *clear* case for relief; (2) when the case is tried on its merits, the evidence of a *bona fide* attempt to pay the tax must be clear, cogent, and convincing; and (3) any immediate and direct act of the treasurer which prevents the property owner from paying the tax may, likewise, be a ground for relief.

"The matter before us thus narrows itself to the inquiry whether or not respondent established by clear, cogent, and convincing evidence that he had made a *bona fide* effort to pay his taxes, or, in the alternative, whether or not the deputy treasurer, by some immediate and direct act of her own, prevented respondent from paying the taxes. If respondent did make such effort, or if the deputy did commit such an act, then that effort or that act discharged the lien of the tax, and, as a consequence, there was no basis in law for the tax sale, and none to support the validity of a tax title in appellants. If both elements just mentioned are present, there would be still greater reason for the same result. . . .

"It may be conceded that the deputy had no intention to misrepresent matters to respondent. It may also be conceded that, if Nalley had carefully checked the statements received by him, he might have discovered the error, although in our opinion that is doubtful, owing to the complex nature of the legal descriptions of the property and his lack of knowledge concerning such matters. However, if he can be at all charged with neglect in that respect, his mistake, or rather the mistake of the deputy, was one which, in our opinion, Nalley would not, under the circumstances, have discovered by the exercise of ordinary prudence. As stated in *Puget Sound Nat. Bank v. Biswanger,* 59 Wash. 134, 109 Pac. 327:

" 'It is not the policy of the law that the owner should lose his land through excusable mistake, and while it may not be

said that there was any negligence on the part of the treasurer in this case, the fact remains that an honest attempt had been made on the part of the owners to pay the taxes, and that the mistake was one which the exercise of ordinary prudence would not detect.' "

In that case, the "immediate and direct act" of the treasurer that prevented the payment of the taxes was the omission of certain lands from the descriptions of the tax statements. Here it was the omission of the back taxes from the statement that prevented their immediate payment at that time. This case is typical of the evil sought to be avoided by the legislature in requiring that, when current taxes are paid, the back taxes be shown on the tax receipt.

The futility of paying current taxes and permitting foreclosure for back taxes is apparent. The notation "B. T." on the receipt is not a compliance with Rem. Rev. Stat., § 11246. One who attempts to pay all his taxes has a right to the protection of the statute and, upon being misled as to the amount due by the statement prepared by the treasurer, may have the foreclosure set aside.

In urging an affirmance of the trial court, the respondents say:

"To hold otherwise would be to cast such a cloud on tax titles as to effectively destroy the value of the lien for delinquent taxes and deprive the State of the means for enforcing tax collections through foreclosure sales. It would return tax titles to the speculative state existent before the enactment of the present tax foreclosure laws with the result that prospective purchasers would be discouraged from buying even at county resales."

This, in effect, urges that tax titles should take free from any of the owner's equitable rights. That might seem highly desirable from the purchaser's point of view.

However that may be, the rule of *caveat emptor* applies to a purchaser at a tax sale. *Shelton v. Klickitat County*, 152 Wash. 193, 277 Pac. 839.

We have discussed the case No. 90773 (Pierce county), a reversal of which makes it unnecessary to discuss cause No. 3030 (Pierce county).

456

The order of dismissal is reversed, with directions to set aside the decree of tax foreclosure and cancel the treasurer's deed to the land in question.

MILLARD, SIMPSON, SCHWELLENBACH, and ABEL, JJ., concur.

[1] Reported in 178 P. (2d) 725.