**ANCHORAGE INDEPENDENT SCHOOL DISTRICT, Appellant,**

v.

**Hadley W. STEPHENS, Appellee.**

**No. 105.**

Supreme Court of Alaska.

April 3, 1962.

Harold J. Butcher, Anchorage, for appellant.

Lloyd Duggar, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Justice.

The basis for this action by Stephens against the Anchorage Independent School District is his complaint that real property owned by him was sold by the District unlawfully for "fictitious and illegal" taxes.

The property had been purchased by Don J. and Evelyn Perron on September 21, 1951, although their deed was not recorded until January 15, 1952. For the 1952–53 tax year the District imposed a tax of $16.-65 based on an assessed valuation of $300. The Perrons paid this bill on October 31, 1952, and were issued a receipt. On June 9, 1953, the property was reassessed by the District's board of equalization, based on a belief that there were certain buildings on the property which had been erroneously assessed to the adjoining lot. An additional $76.61 was then owing, but was not paid. The court found from the evidence that the Perrons had no notice or knowledge of the reassessment.

The Perrons paid their taxes for the 1953–54 assessment year, and were given a

receipt which on its face did not indicate the delinquent tax resulting from the June 9, 1953, reassessment.[1] On February 1, 1954, they sold the property to Stephens, and as evidence that all taxes had been paid produced the 1952–53 and 1953–54 tax receipts. Stephens made no further inquiry, believing from this that all taxes had been paid. Later Stephens paid the 1954–55 taxes, and was given a receipt which again did not show any delinquency.[2] The tax remained unpaid, and in October 1954, a tax lien was foreclosed and the property sold, with the District becoming the purchaser at the sale.

Stephens first became aware of the sale of his property by the School District in January 1956, when he applied for and was refused a bank loan because a title report disclosed that the property had been sold for delinquent taxes. He waited for six months, and then redeemed the property by paying $135.32 under protest. Approximately two years later he commenced this action against the District. He sought to recover not only money he had paid to redeem his property, but also what he termed "general damages".[3] According to his testimony, this comprised (1) loss of profits from being unable to expand a trailer court on other property, which he alleged was the result of his inability to negotiate the bank loan in January 1956, and (2) the value of the time spent by him in visiting his attorney's office and other offices in connection with this controversy, which he set at the rate of $4 an hour. The court awarded Stephens $700, the amount he asked in the original complaint, and the District has appealed.

1. *Recovery of Money Paid to Redeem Property.*

■ When Stephens paid his taxes in 1954 and was issued a receipt which failed to show in a space provided that back taxes were delinquent, it is reasonable that he should rely upon this as tacit assurance by the taxing body that his property was free from encumbrances. In this state of fact we apply the equitable rule which invalidates the sale of property for taxes when the property owner's good faith attempt to pay has been frustrated by misinformation of a public official required to give information.[4]

The lien foreclosure and sale being invalid, Stephens was entitled to have the sale set aside in an appropriate action seeking that relief.[5] Rather than take that course of action, he cleared the property of the encumbrance by paying the redemption price demanded by the District and receiving from it a certificate of redemption. The question is whether he had the right to recover the amount he paid to redeem.

■ We hold that he was entitled to that recovery. The original assessment was made in the spring or summer of 1952 following a physical inspection of the property by one of the District's tax appraisers. Based on that assessment the property owners were notified that a certain tax had been levied against the property and would be delinquent if not paid prior to October 1 of that year. The owners paid the tax on September 15, and thus accepted the valuation placed on the property by the District's assessor. There is nothing in the record indicating that prior to the date of payment

---

1. On the face of the receipt, in the upper right-hand corner, is the printed note: "A mark on the right indicates taxes in arrears on date of mailing." No mark was made on the 1953–54 receipt.

2. The receipt form had been changed to provide for details of delinquent taxes in the upper right-hand corner as follows: "Delinquent taxes calculated to Oct. 1, 1954; Year; Amount; Penalty; Interest; Total."

3. In the original complaint the amount of such damages was set at $700, and in a second amended complaint, at $1,000.

4. Hilton v. Lincoln County, 178 Or. 616, 169 P.2d 329, 332 (1946); Pierce County v. Newbegin, 27 Wash.2d 451, 178 P.2d 742, 744 (1947); Ratajczak v. Carney, 102 Ohio App. 183, 135 N.E.2d 64, 68–69 (1956); Annot., 21 A.L.R.2d 1273, 1280 (1952).

5. Pierce County v. Newbegin, supra note 4, 178 P.2d at 744.

the assessment was revised or even reviewed by the District's equalization board.

[redacted] In these circumstances, where the power to tax had been exercised by the District and concurred in by the taxpayer, a point of finality had been reached. The District no longer had the authority to go back and create an additional obligation for the taxpayer by increasing the assessed valuation of the property. This rule is reasonably required from the necessity of having a stable system of taxation prevail throughout the taxing area, and to avoid uncertainty as to a taxpayer's financial obligations to the District and as to the status of his property with respect to tax liens.[6]

The District's attempt to reassess the property in 1953 was illegal because of lack of power. It was ineffective for any purpose. The additional tax did not become a charge upon the land, no tax lien was created, and the foreclosure sale was void. But the purported sale did create a cloud upon Stephen's title to the property, and he was compelled under the circumstances to pay the redemption price demanded by the District in order to remove that cloud. He was entitled to recover that amount by virtue of equitable principles which allow a remedy for the recovery of taxes erroneously collected.[7]

2. *Recovery of General Damages.*

[redacted] The general damages Stephens seeks are not recoverable. It is a cardinal rule in the law of damages that a plaintiff, with an otherwise valid right of action, is denied recovery for so much of the losses as are shown to have resulted from failure on his part to use reasonable efforts to avoid or prevent them.[8] This rule applies whether the action is in tort or breach of contract and is known as the avoidable consequences rule. The imposition of this rule is a recognition that legal rules are designed not only to prevent and repair individual loss and injustice, but to protect and conserve the economic welfare and prosperity of the whole community.[9]

The rule has been held applicable in a number of cases involving attachment and replevin actions, the courts holding that the person whose property was wrongfully seized under legal process must give bond and procure return of the property to reduce damages.[10] We see no difference in these actions from that of a wrongful seizure via the legal process of a foreclosure proceeding.

[redacted] Stephens learned of the foreclosure proceeding shortly after he applied to the bank for a loan. In fact, the bank ran a title search which showed the sale to the District of the property, and informed Stephens of it. Stephens admitted in testimony that he could have paid the tax and recovered his property the same day. There was no question of his financial ability to pay[11] the redemption costs, a sum of $135.-32, and he did in fact pay it six months later.

When asked why he did not redeem the property immediately to avoid the damages he now claims, Stephens testified:

> "The reason, it takes a few words to explain, the reason I did not pay it, one reason, my reason at that time, I believe that they were men of good faith and

6. See State v. Doster-Northington Drug Co., 196 Ala. 447, 71 So. 427, 429 (1916).

7. Stone v. White, 301 U.S. 532, 534, 57 S.Ct. 851, 81 L.Ed. 1265, 1269 (1937).

8. Southport Transit Co. v. Avondale Marine Ways, 234 F.2d 947, 951–954 (5th Cir. 1956); Lynch v. Call, 261 F.2d 130, 132 (10th Cir. 1958); McCormick, Damages § 33 (1935).

9. McCormick, Damages § 33, at 127 (1935).

10. Adams v. Thibault, 49 Wash.2d 24, 297 P.2d 954, 957, 57 A.L.R.2d 1372, 1376 (1956) (attachment); Annot., 33 A.L.R. 1479 (1924) (attachment); 164 A.L.R. 758 (1946) (replevin); 81 A.L.R. 282 (1932) (generally).

11. A less strict rule applies when financial ability to do what is necessary is in question. McCormick, Damages § 38, at 141 (1935).

they would straighten out their mistake, but I did not believe that I should go to them in person, because I did not believe that they would do anything for me in person, so I went to my attorney and I believed that he could straighten it out, but I did not pay it, because I did not think I had to pay it. I did not think I had to pay what I considered as blackmail in order to preserve a legal remedy."

This explanation does not justify relieving Stephens of the avoidable consequences rule.[12] This is more pointedly true when we consider the fact that the redemption price was a comparatively lesser sum when he was faced with the loss of a $4,000 loan and an alleged net loss of profits of $2,160 for a one-year period.

Both parties assume that there is before us for review the question of whether a school district is immune from tort liability. The crux of the alleged tort is that a negligent misrepresentation caused a pecuniary loss. Principles of law in this area are not well defined.[13] And difficulties are increased by the fact that the only possible negligent act was the failure to note the delinquent tax on the tax receipts.

We have held that Stephens can recover the redemption price on equitable principles—not on any theory of tort liability. We have also held that he was not entitled to the general damages he seeks. Therefore, it is unnecessary to determine whether there was a case of actionable negligence or whether the District may be sued in tort, and we decline to decide those points in this case.

The judgment is modified to reduce it in the amount of $700, and as so modified is affirmed.

12. Note the language in Severini v. Sutter-Butte Canal Co., 59 Cal.App. 154, 210 P. 49, 50 (1922); Gilbert v. Crosby, 160 Miss. 711, 135 So. 201, 203–204 (1931); McCormick, Damages § 39, at 145 (1935); Marcell v. Midland Title Guarantee & Abstract Co., 112 Neb. 420, 199 N.W. 731, 732 (1924).

13. Prosser, Torts § 88, at 541–545 (2d ed. 1955); Restatement, Torts § 552 (1938); Smith, Liability for Negligent Language, 14 Harv.L.Rev. 184, 194–195 (1900); Bohlen, Misrepresentation as Deceit, Negligence, or Warranty, 42 Harv.L.Rev. 733 (1929); Seavey, Mr. Justice Cardozo and the Law of Torts, 52 Harv.L. Rev. 372, 399–401 (1939); Courteen Seed Co. v. Hong Kong & Shanghai Banking Corp., 245 N.Y. 377, 157 N.E. 272, 273–274, 56 A.L.R. 1186, 1188–1189 (1927); Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (1931).