**DANZAS, LTD., Plaintiff,**

v.

**NATIONAL BANK OF ALASKA, Defendant.**

**Civ. No. A–49–61.**

United States District Court
D. Alaska,
at Anchorage.
Oct. 24, 1963.

George J. Toulouse, Jr., and Samuel J. Wettrick, of Wettrick, Toulouse, Lirhus & Hove, Seattle, Wash., for plaintiff.

Daniel A. Moore, Jr., of Plummer, Delaney & Wiles, and Ronald Benkert and Clifford J. Groh, Anchorage, Alaska, for defendant.

HODGE, Chief Judge.

By this action plaintiff seeks to recover from the defendant bank the sum of $36,-731.42, together with interest and costs, representing the amount of two collection letters, with bills of lading and sight drafts attached, sent to the bank for collection through the First National City Bank of New York, by reason of the defendant bank having wrongfully delivered the bills of lading to the consignee, the Hotel & Restaurant Corporation, of Anchorage, without collecting the charges against the shipments in accordance with the instructions contained in the collection letters, thus enabling the consignee to obtain possession of the goods without payment.

Plaintiff (formerly Danzas & Co. Ltd.), is a corporation existing under the laws of the Confederation of Switzerland, engaged in the business of international shipping and forwarding agent and broker for shippers, and the defendant bank is a corporation existing under the banking laws of the United States, conducting a general banking business in the city of Anchorage. Jurisdiction of this court is based upon Section 1332, Title 28 U.S.C.A. For brevity, the plaintiff will be referred to herein as "Danzas," the defendant bank as "NBA," the First National City Bank of New York as "Citibank," and the Hotel & Restaurant Corporation as the "H & R Corporation."

The uncontroverted facts, as established by the pre-trial order, numerous exhibits, and the oral testimony adduced at the trial, although somewhat complicated, may be summarized as follows:

On February 15, 1960, an order was placed with Danzas by letter from one August Pellet, of the H & R Corporation, accepting the bid of Danzas as to freight and other charges for shipment of a number of prefabricated houses, called chalets, which H & R Corporation had purchased on contract from one Murer, a Swiss manufacturer, together with roofing tiles, which letter provided that

> "Payment will be made, as usual, upon receipt of the documents, through the National Bank of Alaska at Anchorage."

This letter also included shipping instructions.

Such shipment was accomplished by two separate bills of lading executed at Antwerp, Belgium, the first denominated as B/L No. 7 being dated April 7, 1960, covering four of the chalets, together with roofing tiles, and the second being B/L No. 9, being accomplished at Antwerp on May 4, 1960, covering the remainder of the chalets plus roofing tiles. Both bills of lading were executed in triplicate. No. 7 provided for shipment on the SS TANNSTEIN from Antwerp and No. 9 provided for shipment on the SS NECKARSTEIN from Antwerp. Both were order bills of lading, the shipper being Danzas, consigned to the order of Danzas to notify simultaneously the H & R Corporation of Anchorage and Arthur J. Fritz & Co., customhouse broker at Seattle, Washington. In both instances the port of discharge was Seattle. No. 7 provided that the final destination as to one of the chalets and tiles was to be Seattle and the remainder to be "REFORWARDED VIA SEAWARD PER ALASKA STEAMSHIP CO. TO ANCHORAGE." No. 9 likewise provided as to some of the parcels final destination at Seattle and the remainder to be likewise reforwarded to Anchorage.

Danzas submitted the bills of lading to Citibank, by letter, for collection through

NBA. On April 26 Citibank sent to NBA for collection on behalf of Danzas as its agent a collection letter with sight draft and two executed copies of B/L No. 7 attached. On May 25 Citibank sent for collection to NBA on behalf of Danzas a second collection letter with sight draft and two executed copies of B/L No. 9 attached. The third executed copies of the bills of lading were retained by Citibank. The amount of the two drafts represented the balance of the purchase price of the chalets, one-half having been paid, plus collection charges, amounting to $36,686.52, later adjusted by pre-trial order account differences in exchange to $36,731.42, the amount sued upon. Both collection letters contained the following instructions:

"Deliver documents against payt [or payment] * * * The item described is enclosed for collection and remittance in New York funds. Advise payment and/or remit only when actually and finally paid in cash or its equivalent. If unpaid report promptly giving reason for dishonor. Wire dishonor on items for $1000.00 or more * * * Return without delay dishonored nondocumentary items unless otherwise instructed * * * Do not hold items for convenience of parties. Release documents only as instructed * * * No protest."

The first collection letter was received by NBA on April 29, 1960, and the second on May 27, 1960, and the consignee H & R Corporation notified.

The shipment on board the TANNSTEIN arrived at Seattle on May 21, 1960, and the shipment on board the NECKARSTEIN arrived June 9, 1960. Both the H & R Corporation and Arthur J. Fritz & Co., agent of the H & R Corporation, were notified.

The bills of lading had been endorsed by Danzas prior to being mailed to NBA and were endorsed by Arthur J. Fritz & Co. as agent and broker for the H & R Corporation on or about May 17 and June 21, respectively.

One set of B/L No. 7 left the possession of NBA some time between April 26, 1960 and May 17, 1960; and one set of B/L No. 9 left the possession of NBA some time between May 27, 1960 and June 20, 1960. The possession of the bills of lading was obtained "in some manner" by an agent of the consignee and they were thereafter delivered to Arthur J. Fritz & Co. by August Pellet. B/L No. 7 was delivered in person by Pellet on or about May 17, 1960 and B/L No. 9 was sent to Fritz & Co. by Pellet by letter dated June 20, 1960.

The consignee H & R Corporation, through its agent at Seattle, took possession of the goods represented by B/L No. 7 and surrendered the bill of lading to Balfour Guthrie Co., agent for the North German Lloyd Line, on May 18, 1960; and also took possession of the goods represented by B/L No. 9 and surrendered the same to Balfour Guthrie Co. on June 21, 1960.

The goods represented by B/L No. 7 were then forwarded by Arthur J. Fritz & Co. to Anchorage in bond on May 25, 1960, by Alaska Railroad domestic bill of lading, by sea to Seward and by rail from Seward to Anchorage, consigned to the Collector of Customs for H & R Corporation, and arrived at Anchorage on June 16, 1960 with freight, handling, and customs charges amounting to $4,446.81. The second shipment was forwarded by Fritz & Co. to Anchorage by domestic bill of lading of the Alaska Railroad on July 16, 1960, consigned to the H & R Corporation, and arrived in Anchorage on July 26, with freight, handling and customs charges advanced amounting to $10,749.47.

In answer to inquiries from Citibank concerning the collections the officer of the NBA in charge of collections replied by letter dated June 23 that the material covered by the second collection had not yet arrived in Anchorage; and in answer to a further inquiry of June 24 the officer replied that the goods covered by the first collection letter had only partly arrived in Anchorage and that they had no record of receiving the second

collection letter which "may have been lost in transit," asking that Citibank furnish copy, in reply to which Citibank, by letter dated June 27, sent to NBA a duplicate copy of the second collection letter and bill of lading, together with other documents, and asked that original instructions be followed and the documents presented to the drawee for collection.

Nothing further appears to have been done regarding the collections, despite further inquiry from Citibank, until NBA received a letter from Ann Pellet, sister of August Pellet and president of H & R Corporation, dated August 1, 1960, stating that August Pellet had suffered a heart attack and that his present whereabouts were unknown. (He later turned up in Brazil.) NBA then sent telegrams to Murer and Danzas in Switzerland to this effect, seeking to work out other arrangements regarding the merchandise. In answer to a further inquiry by Citibank of August 18, NBA advised that they still had the documents in their possession, that the merchandise had arrived at Anchorage, was being held by the Alaska Railroad at the railroad freight terminal, and that they had just received a wire from Danzas stating that a representative of Murer was flying directly to Anchorage in regard to the situation. Both Danzas and Murer had meanwhile protested the "new arrangements" but Danzas later advised that Murer was flying to Anchorage. Murer arrived about August 23, examined the merchandise and left without contacting NBA. At this time the Alaska Railroad had claims for storage, customs charges, freight and expenses in excess of $15,-000.00. Meanwhile, on August 11, 1960, a writ of attachment issued out of the Superior Court for the State of Alaska was served upon the Alaska Railroad in a case of Price-Rite Meat Co. vs. the H & R Corporation, attaching the goods for the sum of $30,000.00, in which case judgment was entered against said corporation in the sum of $22,000.00, subject to the lien of the Alaska Railroad. Finally, on May 31, 1961, pursuant to published notice, the goods were sold by the Alaska Railroad in satisfaction of its lien, amounting at that time to $28,-183.78.

On September 24 Danzas requested the return of all documents sent NBA for collection. NBA returned to Citibank as uncollected the collection letters and drafts, together with one set of the bills of lading. Citibank advised that one set of the bills of lading was missing on each shipment, to which NBA replied that only one set of the bills of lading were attached to the collection letters.

The drafts were never paid. After some further correspondence Danzas advised NBA that it would hold the bank liable, following which this suit was instituted.

No satisfactory explanation was given by any officer of the bank as to how Pellet obtained possession of one set of the bills of lading. The officer in charge of collections stated that he had shown the bills of lading to Pellet over the counter in June, at which time Pellet informed him that the tiles had not yet arrived. This officer also testified that he cannot remember ever surrendering the bills of lading to Pellet, and that he did not know whether they had received two sets of the bills of lading. He insisted that he did not promptly report notice of dishonor for the reason that Pellet never refused payment. Another officer of the bank testified that he made an investigation of the matter, examining all of the bank's files, and determined that no one in the bank had handed over the documents to Pellet but that they had assumed that there was only one original bill of lading with each collection and later found that this was wrong when so informed by Citibank. Another officer testified that he did not know whether the bank ever actually presented the drafts to H & R Corporation for collection, or how the bills of lading got into the possession of the consignee without payment. There was considerable evidence to the effect that NBA had dealings with Pellet regarding collections of trade acceptances for some five years and had made numer-

ous loans to the H & R Corporation, together with a loan then pending to the Swiss Chalet Corporation, of which Pellet was secretary-treasurer, of $35,000.00, all of which may serve to explain, but not excuse, the apparent confusion in the bank's records of the various and sundry accounts of August Pellet.

It is well settled that a bank which, contrary to instructions, surrenders a bill of lading to the consignee without collecting the amount due thereon is liable as for a conversion for the damages occasioned thereby; that where the consignor expressly makes payment a prerequisite to the surrender of the bill of lading it is the duty of the bank to withhold the bill of lading until payment is made; and if the bank surrenders the instrument to the consignee in violation of the instructions, or without fulfillment thereof, and the goods are finally sold by the railway company for freight and storage charges, it is liable for the amount of the draft. 8 Zollman, Banks and Banking, 1936 ed., Sec. 5504, pp. 280–281; 9 C.J.S. Banks and Banking § 241, p. 495; 13 C.J.S. Carriers § 128 h., pp. 260–261; Hibernia Bank & Trust Co. v. Bank of Topeka, (C.A.5) 288 F. 41; Central Trust Co. of Illinois v. Hanover Trust Co., (1922) 242 Mass. 265, 136 N.E. 336; Second National Bank of Baltimore v. Bank of Alma, (1911) 99 Ark. 386, 138 S.W. 472; Market State Bank v. Farmers' Savings Bank, (1921) 190 Iowa 1112, 181 N.W. 486; Shippee v. Pallotti, Andretta & Co., (1933) 117 Conn. 472, 168 A. 880; Tampico Banking Co. S.A. v. Barker, (C.A.5, 1924) 3 F.2d 136, cert. den. 268 U.S. 699, 45 S.Ct. 636, 69 L.Ed. 1164.

From the evidence in this case I find that the defendant bank did not use ordinary care in the collection of the drafts entrusted to it or in carrying out the express instructions contained in the collection letters, either with regard to notice of nonpayment or release of the documents, thus permitting the duplicate copies of the bills of lading to be surrendered to the consignee without collecting the amount due thereon.

Defendant argues that there can be no conversion without the exercise of an affirmative action or performance, or an expression of will or purpose as distinguished from an omission to act. This is ordinarily true, but the above authorities expressly hold that a wrongful surrender of a bill of lading or a wrongful delivery of the goods, either negligently or willfully made, constitutes in law a conversion of the goods.

Defendant also contends that in any event a bank would be liable only for the actual loss, and not necessarily for the amount of the drafts. The above authorities hold to the contrary, unless it be shown that the actual loss was other than the amount of the drafts. (See especially the Hibernia Bank and Tampico Banking Co. cases.)

Defendant further contends that there was no privity of contract between Danzas and NBA and that therefore: (1) Danzas is not the real party in interest and (2) no loss or damage to Danzas has been shown. The Court determined the first point during the trial, dismissing an affirmative defense to this effect; and I do not find that it is necessary for the plaintiff to prove that it has actually paid Murer for the loss or has agreed to indemnify Murer, for the reason that Danzas acted as agent for Murer as well as the consignee, and was the actual drawer of the drafts.

Defendant had also contended, on the basis of the rule as to a bank taking commercial paper for collection as between correspondent banks, that plaintiff cannot maintain the action against NBA but has recourse only against Citibank. This position likewise cannot be sustained.

Defendant further contends that there is a presumption of negligence only where a bank receives commercial paper entrusted to it and is thereafter unable to return it, citing Matlock v. Citizens' National Bank of Salmon, 43 Idaho 214, 250 P. 648, 50 A.L.R. 1418. I do not find this case controlling, but even if it were con-

trolling there was no evidence to rebut such presumption of negligence.

Defendant further contends that the bills of lading were treated as security for the drafts and that the title to the goods and right to the bills of lading will not pass to the drawee until the goods are accepted, paid for, or secured, or when properly transferred, citing Marshall v. Moultrie Cotton Mills, 52 Ga.App. 515, 184 S.E. 350 and Shaw v. Railroad Company, 101 U.S. 557, 25 L.Ed. 757. These cases are likewise not controlling. In the Marshall case the court found that the consignor was not entitled to maintain a suit for the contract price of goods shipped under a bill of lading where it is shown that the shipment was made through a carrier not designated by the defendant consignee and where the plaintiff abandoned the goods to the carrier. In the Shaw case the court held that the jury had expressly found that there was no negligence on the part of the bank, in a suit to recover possession of cotton delivered under a stolen bill of lading.

Defendant further contends that where delivery of goods on a contract of sale is conditioned on the payment of the purchase price under a uniform sales act, title will not pass to the buyer; but there was no conditional sale contract involved here.

 Finally, defendant urges that title to the goods was not divested by transfer of the bills of lading, that the plaintiff, as agent of the seller, never lost title to the chalets and hence could have recovered them from the Alaska Railroad through replevin action or injunction, or in any event was obliged to mitigate its damages by taking such action. There is no doubt but that upon delivery by Pellet of the duplicate original negotiable bills of lading to his agent Fritz & Co. and the surrender of the goods to Balfour Guthrie & Co. as agents of the North German Lloyd Steamship Co. on instructions from Pellet, title to the goods passed to the H & R Corporation. Therefore, as correctly testified to by the witness J. Glen Cassity, solicitor for the Alaska Railroad, the railroad could not deliver the goods to anyone other than the consignee. It is further held that the doctrine of avoidable consequences, or the duty of plaintiff to prevent or minimize damages, does not apply unless one injured by the wrongful or negligent acts of another may protect himself with reasonable effort or at a trifling expense, and that the injured party is not required to make expenditures which, in comparison with the injury threatened, are considerable, for the purpose of protecting his property. 15 Am.Jur., Damages, 420, Sec. 27; 425, Sec. 29; McCormack on Damages, 1935 ed., p. 130; Anchorage Independent School District v. Stephens, (Alaska, 1962) 370 P.2d 531. It can hardly be said that Danzas or the former owner, Murer, was obliged to pay off the very considerable charges of the Alaska Railroad and an attachment lien in order to obtain possession of the goods even if they could in law do so.

It must be concluded that the defendant bank is liable to plaintiff for the amount sued upon. No further Findings of Fact or Conclusions of Law are necessary. Judgment may be entered by the Clerk in favor of the plaintiff and against defendant in accordance with Rule 58, F.R. Civ.P. in the sum of $36,731.42, together with plaintiff's costs, to be taxed by the Clerk.

 The plaintiff prays for interest on the amount of the judgment from June 1, 1960. The allowance of interest prior to judgment in diversity cases is governed by state law. The interest statute of Alaska [1] provides that the rate of interest shall be six per cent per annum on moneys after the same become due and upon moneys due upon a settlement of matured accounts from the date the balance is ascertained. But such interest may not be allowed on unliquidated claims; and it is further held that interest may not be allowed where liability for the claim is not determined until the

1. Sec. 45.45.010, Alaska Statutes.

date of trial. Columbia Lbr. Co. v. Agostino, 9 Cir., 184 F.2d 731. Chirikoff Island Cattle Corp. v. Robinette, Alaska, 372 P.2d 791. Therefore interest may not be allowed except after judgment.

 Plaintiff also prays for the allowance of a reasonable attorney's fee. The allowance of attorneys' fees in diversity cases is likewise governed by state law. Stokes v. Reeves, (C.A. 9) 245 F.2d 700. Alaska law provides for the allowance to the prevailing party, in the discretion of the Court, of attorneys' fees as a part of the costs of the action.[2] It is reasonable to impose such fee in this instance, except that the amount thereof should be governed instead by the rules of this court.[3] Such fee may therefore be allowed in accordance with the rule of this court, amounting to $808.65, to be taxed as a part of plaintiff's costs.

---

**2.** Sec. 09.60.010, Alaska Statutes; Rule 82, Rules of Civil Procedure.

**3.** Rule 25, Amended Uniform Rules of the District Court for the District of Alaska.