Lyle TATUM et al., Plaintiffs,

v.

Rogers C. B. MORTON, Individually and in his official capacity as Secretary, Department of the Interior, et al., Defendants.

Civ. A. No. 398–72.

United States District Court, District of Columbia.

Dec. 14, 1974.

James M. Johnstone and William A. Anawaty, Washington, D. C., for plaintiffs.

Edward L. Curry, Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on plaintiffs' motions for determination of appropriate damages, expungement of arrest records, and award of attorneys' fees.[1]

## I. FACTS.

On Sunday, April 25, 1971, plaintiffs were participating in a peaceful Quaker vigil of prayer on the White House sidewalk, seeking to bring about a change in this country's Vietnam war policy. When persons thought to be "outsiders" joined the vigil, police lines were established, and the vigil participants were ordered to disperse. When the plaintiffs refused, they were arrested, photographed with the arresting officers, placed on busses and transported to places of detention. There they were "booked," including fingerprinting and photographing, and confined in cells.

About three to four hours after the arrests took place, all plaintiffs except one were offered the opportunity to post ten dollars collateral and be released. Seventeen of the twenty-eight adult plaintiffs refused to post collateral,

> because, as some of them testified in substance on deposition, (1) they believed that their arrests were unjustified and that posting collateral would somehow give an air of legitimacy to the arrests; and (2) they held the conviction as a matter of conscience that they could not participate in the bail system which discriminated against persons without sufficient money to "buy" their release.[2]

These plaintiffs complain of a variety of indignities before being released the next morning.

On March 13, 1974, this Court held the arrests were unlawful and that Inspector William Trussell of the Metropolitan Police Department who ordered the arrests was individually liable and that the District of Columbia was liable for the actions of Inspector Trussell.[3]

---

1. There were twenty-nine plaintiffs in the original action. Two plaintiffs, Keith Miller and Kathy Miller, are not parties to the motion for damages.

2. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Determination of Appropriate Damages at 4.

3. The issue of the liability of D. C. Police Chief Jerry Wilson for negligence in guidance and training in the use of the police line has yet to be decided.

## II. DAMAGES.

The first issue before the Court is the determination of appropriate damages. The parties have filed pleadings for the Court's consideration, and a hearing has been held in which eight plaintiffs testified.

Plaintiffs are seeking $775,389.40 compensatory damages. They are also seeking $2,700.00 punitive damages against Inspector Trussell ($100.00 per plaintiff) and $27,000.00 punitive damages against the District of Columbia ($1,000.00 per plaintiff). Plaintiffs itemize this as $10,000.00 per plaintiff for the disruption of the vigil demonstration, $10,000.00 per plaintiff for the arrest without cause, attendant indignities and brief incarceration; $10,000.00 for each of the seventeen plaintiffs who refused to post collateral and incurred longer confinement and additional indignities; and lesser amounts for plaintiffs who suffered particular injuries.

### 1. Injuries.

The first question is what injuries should be the subject of compensation. In order to determine the answer, the Court must decide whether the plaintiffs may recover damages for those injuries which followed upon their refusal to post collateral.

"Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages." Chesapeake & Ohio Ry. v. Kelly, 241 U.S. 485, 489, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1915). A corollary of this general rule is that a party cannot recover damages flowing from consequences which that party could reasona-

bly have avoided. Alcoa Steamship Co. v. Charles Ferran & Co., 251 F.Supp. 823, 832 (E.D.La.1966). The obvious reason for this is that "the community's notions of fair compensation to an injured plaintiff do not include wounds which in a practical sense are self-inflicted." Ellerman Lines, Ltd. v. The President Harding, 288 F.2d 288, 290 (2nd Cir. 1961). This is especially true if the injured party can protect himself against additional adverse consequences at a "trifling" expense. Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504, 511 (9th Cir. 1957); Danzas, Ltd. v. National Bank of Alaska, 222 F.Supp. 671, 677 (D.Alaska, 1963); Bancroft v. Indemnity Insurance Co. of North America, 203 F.Supp. 49, 54 (W.D.La.1962). The word "trifling" means a sum which is trifling in comparison with the consequential damages which the party is seeking to recover in a particular case. 22 Am.Jr.2d Damages § 32 (1965), citing Bear Cat Min. Co. v. Grasselli Chemical Co., 247 F. 286, 288 (8th Cir. 1917).

Here the cost of posting collateral was $10.00 per plaintiff, which amount would have been returned upon the dismissal of the charge; the amount of subsequent damages is alleged to be $10,000.00 per plaintiff. Nothing more need be said. Ten dollars in this context is a trifling sum of money. This is particularly true since the law in adjudicating such cases makes no distinction between those posting and those not posting collateral.

Plaintiffs argue that since one need not sacrifice or compromise a substantial contract or property right in order to mitigate damages,[4] then, *a fortiori*, he should not be required to sacrifice or

---

4. Plaintiffs cite Richard v. Waldman & Sons, Inc., 155 Conn. 343, 232 A.2d 307 (1967) (no duty to seek zoning variance to mitigate damages where land seller represented that the property conformed to zoning laws); Camp v. Cohn, 151 Conn. 623, 201 A.2d 187 (1964) (no duty to extend time of performance of contract to mitigate damages where time was of the essence); Eastern Sports-

wear Co. v. S. Augstein & Co., 141 Conn. 420, 106 A.2d 476 (1954) (no duty to mitigate damages where doing so would adversely affect the good will of the complainant's business); Plesofsky v. Kaufman & Flonacker, 140 Tenn. 208, 204 S.W. 204 (1918) (no duty to mitigate damages for breach of contract by acceding to the seller's demand to pay cash).

compromise a religious or conscientious conviction, either.

Those narrow exceptions to the general rule are irrelevant to this case. Posting collateral would not have compelled plaintiffs to compromise or sacrifice any rights. It would have enabled them thereupon to get out of jail without making any admission of guilt. They still would have had the opportunity for their day in court and ultimate success. This was explained to most, if not all, of the plaintiffs by a legal aid lawyer and the police. Instead they preferred to protest the bail system by refusing to post collateral.

Furthermore, federal courts have held that even in constitutional tort cases under 42 U.S.C. § 1983 plaintiffs have a duty to mitigate damages.[5] Particularly pertinent to this case is Doherty v. Wilson, 356 F.Supp. 35 (M.D.Ga.1973), in which the plaintiff, found to be a qualified teacher by the Sumter County, Georgia, Board of Education, was nevertheless denied employment because she lived at Koinonia Farms, an interracial, religiously oriented communal farm in Georgia. The Court held that the Board's action violated her first amendment right of free association and ordered that she be offered the first available teaching position for which she was qualified. But it refused to award her back pay because she had not taken reasonable steps to mitigate damages.

> Mrs. Doherty made only one other application for employment after receiving notice that the Sumter County School Board would not hire her. She made no other applications for employment as a teacher for the 1972–73 school year with nearby Lee County or any other county. This lack of effort to find other employment, plus the defiant attitude taken by plaintiff . . . when [she] appeared before

the board, plus the disapproval of personal wealth reflected in plaintiff's lifestyle, indicate that plaintiff's primary interest was to vindicate an infringement of her rights rather than to earn money.

*Id.* at 41.

The similarity between that plaintiff and these plaintiffs is apparent. Both refused to take reasonable steps to mitigate damages. Both were primarily interested in vindicating an infringement of their rights. In addition, the Quaker plaintiffs were protesting the bail system, even though that issue was extraneous to the cause of the arrest. To borrow from the Court in *Doherty,* it was clearly their right to do this, but by doing so they failed to take reasonable steps which could have avoided at least in part subsequent injuries. Their failure to take reasonable steps to avoid the consequences of the prolongation of detention makes it inappropriate for this Court to award damages for injuries alleged to have been received by or during the prolongation of detention. *Id.*[6]

■ Injuries common to all plaintiffs for which damages may be awarded are the disruption of the vigil in violation of the first amendment, the illegal arrest and brief incarceration in violation of the fourth and fifth amendments, attendant publicity, and mental distress.

#### 2. Amount.

The second question is the amount of damages to be awarded. While it is relatively easy to list injuries for which the law provides nominal or compensatory damages, it is much more difficult to determine the appropriate amount, especially where, as here, the injuries are of an intangible nature. There are certain principles to which the Court may look for guidance, but in the end the particu-

5. See, *e. g.,* Gieringer v. Center School District No. 58, 477 F.2d 1164, 1167 (8th Cir. 1973) ; Ramsey v. Hopkins, 447 F.2d 128 (5th Cir. 1971) ; Hegler v. Board of Bearden Sch. Dist., Bearden, Ark., 447 F.2d 1078, 1081 (8th Cir. 1971) ; Whirl v. Kern,

407 F.2d 781, 797 (5th Cir. 1969) ; Smith v. Hampton Training School for Nurses, 360 F.2d 577, 581 (4th Cir. 1966).

6. See also Williams v. Albemarle City Bd. of Ed., 485 F.2d 232 (4th Cir. 1973).

lar facts and circumstances of each case are determinative.

■ Nominal damages are presumed to follow from the violation of any valuable legal right, even if no actual damages are involved. Basista v. Weir, 340 F.2d 74, 87 (3rd Cir. 1965); Magnett v. Pelletier, 360 F.Supp. 902, 907 (D.Mass. 1973). "The term nominal damages means a trivial sum—usually one cent or one dollar—awarded to a plaintiff whose legal right has been technically violated but who has proved no real damage." Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App.D.C. 206, 194 F.2d 888, 890 (1952).

■ In addition, compensatory damages may be recovered for injuries resulting from defendants' violation of plaintiffs' constitutional rights. For some of these injuries, such as the loss of a day's pay by one of the plaintiffs, the amount of damages can be measured with certainty. For other injuries of a less tangible nature, such as publicity, humiliation, and outrage, the amount of damages cannot be ascertained with specificity. Such uncertainty as to the amount of damages will not bar recovery, but the amount of recovery will be fixed in the sound discretion of the trier of fact, in this case, the Court. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 563–566, 51 S.Ct. 248, 75 L.Ed. 544 (1930). In fixing the amount of recovery, the trier of fact may make reasonable inferences from the facts and circumstances in evidence. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1945).

In seeking damages of over $775,000.-00, plaintiffs have stressed the importance of their constitutional rights to them, the outrage they felt at having those rights violated, their humiliation in being arrested and briefly incarcerated, and the adverse effect of the publicity attendant to their arrest. The Court does not believe the facts of this case warrant such a massive recovery. Indeed, in fixing damages there are two facts which the Court finds to be controlling in this case. Both of these facts indicate the appropriateness of a limited recovery.

■ The first of these is that plaintiffs were participating in a demonstration. Their purpose in conducting their prayer vigil publicly in front of the White House rather than privately in a meeting house was to receive publicity. Plaintiffs contend they congregated in response to a newspaper story in which President Nixon had attributed his Vietnam war policy to his Quaker background. These plaintiffs wanted "to hold him in the light" not only to influence him to change his war policy but also to publicly proclaim the Quaker heritage of pacifism. Therefore the publicity incident to their arrest was one of the objectives sought by them. This Court is unable to find that plaintiffs were greatly aggrieved because the light of publicity which they were seeking to have shine on their demonstration shone more brightly than they had anticipated. Louisiana Sulphur Car. v. Gulf Resources & Chem. Corp., 53 F.R.D. 458, 461 (D.Del.1971).

The second fact which the Court finds controlling in this case is that most of the plaintiffs chose not to post collateral and be released from custody when they were given the opportunity to do so. Instead they chose to remain in jail to protest their arrest and the bail system. Despite plaintiffs' protestations of great mental suffering, the reasonable inference the Court draws from their actions is that whatever humiliation and outrage they suffered from the disruption of their vigil and their arrests, it was not so much as to dampen their enthusiasm for demonstrating. The Court does not characterize this opportunity for further witness as a benefit to the plaintiffs. But it does perceive their refusal to post collateral as an indication that their mental distress was not unduly severe. It might be characterized as a sort of self-inflicted mini-martyrdom.

■ In the light of these two controlling facts the Court awards each

plaintiff one hundred dollars ($100.00). In addition, plaintiff F. Miles Day, who was docked a day's pay instead of being permitted to take the day off as part of his vacation after his employer learned of his arrest, will be awarded sixty-four dollars ($64.00). No punitive damages will be awarded since there has been no showing of malice or wanton recklessness on the part of the defendants. Black v. Sheraton Corporation of America, 47 F.R.D. 263, 271 (D.D.C.1969).

In seeking substantial damages, plaintiffs have emphasized the case of Roberts v. Wilson, Civ. A. No. 1436-71, aff'd without opinion, 160 U.S.App.D.C. 149, 489 F.2d 1273 (1974), in which Judge Gesell of this Court awarded compensatory damages of $3,000.00 and punitive damages of $500.00 to each of two plaintiffs who were falsely arrested on May 3, 1971, while they were on their way to work during mass demonstrations in the District of Columbia. They were arrested at 7:30 in the morning and confined in the practice field of D. C. Stadium until 8:30 at night. Then they were transferred to the coliseum and held until four o'clock the next morning.

The Court finds the case at bar distinguishable from Roberts. Neither of the two facts which the Court has found controlling in this case was present in Roberts. Furthermore, the Quaker plaintiffs were incarcerated for a relatively brief time in comparison with the Roberts plaintiffs.

The situation which most closely approximates the case at bar is found in Farber v. Rizzo, 363 F.Supp. 386 (E.D. Pa.1973). On the morning that the President was to speak at Independence Hall in Philadelphia, police refused to permit demonstrators in front of Independence Hall to display anti-war placards. Demonstrators who persisted were arrested and taken to the police station. Later that morning a District judge issued a temporary restraining order against police interference with the first amendment rights of the demonstrators. In violation of the temporary restraining order, the arrested demonstrators were not released, and other demonstrators with placards were subsequently arrested later in the day.

In a court-supervised settlement,[7] each plaintiff arrested and detained between five and nine hours received $750.00 compensatory damages, and each plaintiff arrested and detained between two and four hours received $500.00.

Again, however, the Court finds the instant case distinguishable from Farber. In Farber, the police not only violated the plaintiffs' constitutional rights, but they deliberately persisted in doing so in defiance of a Court Order.

3. Liability.

The third question is how the damages should be apportioned among the defendants. As noted above, Inspector Trussell has been found individually liable and the District of Columbia vicariously liable under the doctrine of respondeat superior for the unlawful and unreasonable arrests of the plaintiffs. The Court has determined that the District of Columbia shall pay the damages and that Inspector Trussell shall make a contribution to the judgment in the amount of $500.00. The Court believes that this amount charged against Inspector Trussell is sufficient compensation for him to pay for his negligence but not so gross as to inhibit "fearless, vigorous, and effective administration of policies of government" on his part in the future. Barr v. Matteo, 360 U.S. 564, 571, 79 S.Ct. 1335, 1339, 3 L.Ed.2d 1434 (1959). If Chief Wilson, the third defendant, is found liable for negligence in guidance and training in the use of the police line, the Court may also order him to make a contribution to the judgment to be paid by the District of Columbia.

7. Farber v. Rizzo, Civ. A. No. 72-2052, Memorandum and Order of Becker, J., April 26, 1974.

## III. EXPUNGEMENT OF ARREST RECORDS.

█ The second issue before the Court is for the expungement of the arrest records of the plaintiffs.[8] The defendants have not attempted to show any legitimate governmental interest that might be served by maintaining the arrest records. They have only suggested that a less drastic remedy might be available. The motion for expungement shall be granted. Sullivan v. Murphy, 156 U.S.App.D.C. 28, 478 F.2d 938 (1973); Menard v. Saxbe, D.C.Cir., 498 F.2d 1017 (1974).

## IV. ATTORNEYS' FEES.

The third issue before the Court is the award of attorneys' fees and costs. Plaintiffs' attorneys are seeking $20,000.00 in fees plus costs for an estimated five hundred hours' work done on this case through April 1, 1974. The hearing on damages and a hearing on Chief Wilson's liability were held after this date. In addition, plaintiffs' attorneys estimate a thousand hours' work done through April 1 on the related case of Tatum v. Wilson [9] in which an award of attorneys' fees is also being sought. At the requested rate of fifty dollars per hour, the total award would exceed $60,000.00.

█ The traditional American Rule is that, absent any contractual or statutory [10] liability, a successful litigant may not recover attorneys' fees as an item of damages or costs from the losing party. "[The Supreme Court] first announced that rule in Arcambel v. Wiseman, 3 Dall. 306, 1 L.Ed. 613 (1796), and adhered to it in later decisions. See, e. g., Hauenstein v. Lynham, 100 U.S. 483, 25 L.Ed. 628 (1880); Stewart v. Sonneborn, 98 U.S. 187, 25 L.Ed. 116 (1879); Oelrichs v. Spain, 15 Wall. 211, 21 L.Ed. 43 (1872); Day v. Woodworth, 13 How. 363, 14 L.Ed. 181 (1852)." Fleischmann Distilling Corp. v. Maier Brewing, 386 U.S. 714, 717–718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967). But there are exceptions to this rule. These exceptions arise out of the Court's inherent equitable power to fashion effective remedies. It is generally accepted that federal courts may award attorneys' fees to a successful litigant when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973), citing 6 J. Moore, Federal Practice, ¶ 54.77[2], p. 1709 (2d ed. 1972). The purpose of this award, which is paid by the losing party, is punitive. Again, federal courts may award attorneys' fees to a party who has acted to protect a fund, in which case the award is paid out of the fund, or to protect the interests of a class, in which case the award is distributed among the members of the class. The rationale for this award is that "[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense."

---

8. This includes plaintiffs Keith Miller and Kathy Miller.

9. Civ. A. No. 2108–73, in which the constitutionality of the police line regulation (Article 6, Section 5(a) of the Police Regulations of the District of Columbia) is challenged.

10. Some federal statutes *require* an award of reasonable attorneys' fees, e. g. Truth-in-Lending Act, 15 U.S.C. § 1640(a)(2) (1970); Organized Crime Control Act of 1970, 18 U.S.C. § 1964(c) (1970); Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) (1970); Communications Act of 1934, 47 U.S.C. § 206 (1970); and the Interstate Commerce Act, 49 U.S.C. § 16(2) (1970).

Other statutes *permit* an award at the discretion of the Court, e. g., Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b) (1970); Labor Management Reporting and Disclosure Act, 29 U.S.C. § 501 (1970); and the Fair Housing Act of 1968, 42 U.S.C. § 3612(c) (1970).

Some state statutes permit recovery of attorneys' fees generally, e. g., Alaska. Alaska Stat. § 09.60.010 (1972). The District of Columbia does not. 15 D.C.Code § 701 et seq.

Mills v. Electric Auto-Lite Co., 396 U.S. 375, 392, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970).

 The case at bar is not brought under a statute that expressly requires or permits an award of attorneys' fees.[11] Nor does it fall within the "bad faith," "common fund," or "benefit to the class" exceptions.

Plaintiffs contend, however, that their case falls within a new exception to the traditional American rule against awarding attorneys' fees and costs—the so-called "private attorney general" theory. This theory was used by the Supreme Court in Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), a suit challenging racial discrimination in a chain of restaurants under the Civil Rights Act of 1964, to make that statute's permissive award of fees [12] all but mandatory.

> When a plaintiff brings an action under [Title II of the Civil Rights Act], he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees—not

simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

> It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.

*Id.* at 402, 88 S.Ct. at 966 (footnotes omitted).

Lower federal courts have applied this theory to cases in which there was no statutory provision for an award of attorneys' fees,[13] the plaintiff was not obligated to pay his attorneys,[14] the suit was for damages,[15] the award was to a successful defendant,[16] and to an unsuccessful plaintiff.[17]

But this Circuit, in recently adopting a form of the private attorney general exception in Wilderness Society v. Morton, D.C.Cir., 495 F.2d 1026 (1974), cert. granted sub nom. Alyeska Pipeline Service Co. v. Wilderness Society, ——— U.S. ———, 95 S.Ct. 39, 42 L.Ed.2d 47 (1974), has been far more circumspect.

In *Wilderness Society* the Circuit Court noted the fact that although several Courts have adopted the private attorney general theory, the Fourth Circuit has been reluctant to do so for fear that "the exception would swallow up the general rule and result in awarding fees to successful parties in all statutory

---

11. This suit is brought under the First, Fourth, and Fifth Amendments to the Constitution of the United States, and 42 U.S.C. §§ 1983 and 1988, and the law of the District of Columbia. Awards of attorneys' fees may be made under these laws at the discretion of the Court, acting within its equitable powers, but they are not specified in the statute. (It should be noted that 42 U.S.C. § 1983 does not apply to the District of Columbia. *See* District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973)).

12. 42 U.S.C. § 2000a–3(b) provides that "the prevailing party" is entitled to "a reasonable attorney's fee" in the court's "discretion."

13. Brown v. Ballas, 331 F.Supp. 1033 (N.D. Tex.1971).

14. La Raza Unida v. Volpe, 57 F.R.D. 94 (N.D.Cal.1972), aff'd. 488 F.2d 559 (9th Cir. 1973).

15. Lyle v. Teresi, 327 F.Supp. 683 (D.Minn. 1971).

16. United States v. Gray, 319 F.Supp. 871 (D.R.I.1970).

17. Sierra Club v. Lynn, 364 F.Supp. 834 (W.D.Tex.1973).

causes of action." *Id.* 495 F.2d at 1031, citing Bradley v. School Board of City of Richmond, 472 F.2d 318, 329–331 (4th Cir. 1972), vacated on statutory grounds, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). The Circuit Court goes on to indicate its sensitivity to that possibility: "Such fears are not lightly to be disregarded, for the American rule barring attorneys' fees to successful litigants except in extraordinary circumstances is based on important policies of its own." *Id.* But the Court concludes,

> [I]f the matter is examined closely, it becomes evident that the private attorney general exception, at least as applied to the factual circumstances of the present case, is not inconsistent with the policies behind the traditional American rule. To the contrary, an award of fees in the present case may be justified by reference to the very same policies.

*Id.*

The Court then examined the rationale behind the American rule. First there is the concern "that parties might be unjustly discouraged from instituting or defending actions to vindicate their rights if the penalty for losing in court included the fees of their opponent's counsel." *Id.* But that concern is not applicable to *Wilderness Society*:

> Whatever force this argument concededly has in the great run of civil litigation, we think it plainly inapposite to the circumstances of the present case. As Alyeska has so often brought to our attention, the value of its investment at stake in this litigation was over a billion dollars. Each week's delay in constructing the pipeline imposed an additional $3.5 million in costs. Any award of fees in this case, though conceivably large in [an] absolute sense, will be paltry in comparison with the interest Alyeska had in defending this appeal. Where the interest at stake is many times greater than the expected cost of one's opponent's attorney's fees, any possibili-

ty of deterrence is surely remote if not nonexistent.

*Id.* 495 F.2d at 1032.

Second there is the concern that the unavailability of attorneys' fees might significantly deter plaintiffs from bringing meritorious litigation.

> This burden was assumed [by The Wilderness Society] not in the hope of obtaining a monetary award, nor to protect an interest peculiar to appellants and their members but rather to vindicate important statutory rights of all citizens whose interest might be affected by construction of the pipeline.

*Id.*

Therefore, concludes the Circuit Court, "An award of fees would not have unjustly discouraged appellee Alyeska from defending its case in court. And denying fees might well have deterred appellants from undertaking the heavy burden of this litigation." *Id.* at 1036. Thus it is possible to award attorneys' fees without transgressing the policies behind the traditional American rule.

■ It should be clear from this discussion that the private attorney general exception adopted by this Circuit in *Wilderness Society* is much too narrow to fit the case at bar. The prospect of paying plaintiffs' attorneys' fees might have compelled the defendant District of Columbia government to make any settlement, including one which might have been considerably more substantial than the damages awarded by this Court, to stay out of court. And although the Quaker plaintiffs were concerned to vindicate important constitutional rights of all citizens, they were also seeking substantial riches for themselves. Indeed, the amount of damages sought were sufficiently extensive to provide the plaintiffs with more than adequate incentive to file.

Therefore this Circuit's narrow form of the private attorney general exception to the general American rule against the award of attorneys' fees, like the other

generally recognized exceptions, does not apply to the case at bar.

■ This is a case in which the award of attorneys' fees is committed to the "unfettered discretion" of the District Court, as one circuit has put it (Ojeda v. Hackney, 452 F.2d 947, 948 (5th Cir. 1972)) in the exercise of its equitable powers. Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). The basic question is whether "the interests of justice" require an award of attorneys' fees. Hall v. Cole, *supra,* 412 U.S. at 4–5, 93 S.Ct. 1943. The Court concludes they do not.

■ This case was not assigned to the attorneys by the Court. There is no question of "involuntary servitude." This was a suit for damages as well as declaratory relief. As noted above, the substantial amount being sought was more than sufficient to provide plaintiffs with incentive to file. Just as important, it was sufficient to enable counsel to seek recompense in a contingent fee or other contractual arrangement. They chose not to do so. Instead they *freely* accepted this case through the American Civil Liberties Union Fund of the District of Columbia.[18] They accepted it with the understanding that the plaintiffs would reimburse only the costs of the action. This the plaintiffs have done, and the Court agrees the plaintiffs should recover those costs. The plaintiffs are to be made whole. But plaintiffs' attorneys waived their fee. Now they want the defendants to pay it. The Court does not believe it is in the interests of justice to compel the District of Columbia government to pay attorneys' fees for services those attorneys freely committed to plaintiffs.

The Circuit Court in *Wilderness Society* cited Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 538 (5th Cir. 1970) and Clark v. American Marine Corp., 320 F.Supp. 709, 711 (E.D.La. 1970), as authority for the proposition that counsel should be reimbursed the reasonable value of his services despite the absence of any obligation on the part of the client to pay attorneys' fees. *Id.* 495 F.2d at 1037. But such a dictum is considerably broader than the Circuit Court's holding in *Wilderness Society,* as we have seen. And it is broader than the holdings of the cases cited. Both of those cases were brought under the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., which makes no provision for recovery of damages but only for injunctive relief and attorneys' fees. The attorneys in those cases did not need to rely on an obligation of their clients to pay their fees because, as we have seen, not only did the statute permit the award of attorneys' fees, but also the Supreme Court in *Newman, supra,* 390 U.S. at 402, 88 S.Ct. at 966, had held that a successful plaintiff under the Civil Rights Act should "ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." That is quite different from the case at bar which commits the award of attorneys' fees and costs to the discretion of the Court rather than grounding them on a statute which has been re-enforced by the Supreme Court.

The Circuit Court also said in *Wilderness Society* that "[s]ubstantial benefits to the general public should not depend . . . upon the charity of public-minded lawyers." *Id.* 495 F.2d at 1030.[19] But to say that public interest litigation should not be dependent upon the charity of public-minded lawyers does not mean that the legal profession does not have an obligation to be charitable. It is axiomatic that it is in the highest tradition of the profession for an attorney freely to volunteer *some* of his time and effort in behalf of a worthy legal cause. To make compensation a matter of right in *pro bono publico* litigation

---

18. Affidavit of James M. Johnstone, Esquire at 2.

19. A similar statement is made at 1037.

would make a mockery of the concept and lend credence to the public's cynical perception of lawyers as comprising a profession motivated solely by self interest if not greed.