Steven **FARBER** et al.

v.

**Frank L. RIZZO, Individually and as Mayor of the City of Philadelphia et al.**

No. 72-2052.

United States District Court,
E. D. Pennsylvania.

June 22, 1973.

Jack J. Levine, David Rudovsky, Philadelphia, Pa., for plaintiffs.

Murray C. Goldman, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

HUYETT, District Judge.

■ President Richard M. Nixon came to Philadelphia on October 20, 1972 to utilize Independence Hall as a symbolic backdrop for the signing of the Revenue Sharing Act. He chose this site, the building in which the Constitution of the United States was drafted, to emphasize the significance of this bill to the concept of federalism established by the Constitution. Others came to Independence Mall, directly across from Independence Hall, to demonstrate to the President their deep disagreement with this nation's policies in Southeast Asia and the continued war there. Persons were arrested that day while peacefully demonstrating with anti-war signs in an area open to the public, while others were prevented from entering Independence Mall because they had such signs. These actions transgressed the spirit of the Declaration of Independence and the letter of the Bill of Rights, which documents are also closely associated with the buildings on Independence Square.

Plaintiffs filed a Complaint and a Motion for a Temporary Restraining Order (TRO) on the morning of October 20, 1972. The Complaint asserted that they and others had been forcibly prevented by defendants from displaying signs, posters and leaflets opposing the President's policies in Independence Mall (Mall), an area to the north and directly across from Independence Hall (Hall) which was open to the public. The Court, after meeting with counsel for plaintiffs and an Assistant City Solicitor, issued a TRO at 12:40 P.M. which forbade interference with the peaceful exercise of First Amendment rights in areas open to the public near Independence Hall.[1] On October 27, 1972, plaintiffs filed a Petition for Civil Contempt claiming numerous violations of the TRO by the defendants. Several days of hearings were held on this petition.

## FACTS [2]

At approximately 9 P.M. on October 19, 1972, about fifty persons congregated in front of Independence Hall on the south side of Chestnut Street between Fifth and Sixth Streets. They were there to take part in an all-night vigil to protest the continued presence of the United States in Southeast Asia. The impetus for this protest was President Nixon's scheduled visit to Independence Hall the next day. The protestors originally intended to remain in that place through the night and until the President arrived. At about midnight, however, at the request of defendant Lt. George Fencl, commanding officer of the Civil Disobedience Squad, they moved across to the north side of Chestnut Street. The south side of Chestnut Street was then made a "security area" barred to the general public. There was no indication then, or later, that the north side of Chestnut Street was a "security area". The protestors, many of whom had anti-war and anti-Nixon placards, spent the rest of the night in a peaceful manner.

---

1. The TRO entered by the Court read: "And now, to wit, the 20th day of October, 1972, upon consideration of the Complaint, Motion for Temporary Restraining Order and argument of counsel, IT IS HEREBY ORDERED THAT a Temporary Restraining Order be granted against defendants restraining the interference in any manner whatsoever with the peaceful exercise of the

First Amendment rights of plaintiffs and other members of the public which shall include the carrying of signs in any area in the vicinity of Independence Hall where the public is otherwise permitted to assemble."

2. This section shall comprise the Findings of Fact required by Fed.R.Civ.P. 52.

On the morning of October 20, at approximately 7 A.M., Lt. Fencl ordered the persons with signs on the north side of Chestnut Street to leave that area. He indicated that that area would be closed to persons with signs or leaflets and that anyone desiring to demonstrate in that manner would have to go to an area at Fifth and Market Streets, a block away. They were told, however, that if they relinquished their signs and leaflets they could remain where they were. About fifteen minutes later sixteen persons, all of whom are plaintiffs in this case,[3] were arrested by police at the direction of Lt. Fencl. At this time they were peacefully carrying signs and standing on the sidewalk on the north side of Chestnut Street. They were not interfering with either vehicular or pedestrian traffic. Plaintiff Steven Farber, Esquire, who had just arrived at the scene to serve as a legal adviser, picked up a sign dropped by one of the persons arrested. He was arrested when he refused to put down the sign or get out of the area. These persons were all taken to the Police Administration Building where they were fingerprinted and placed in the cell room. No charges were placed against them at that time or later. Anyone who relinquished his sign was permitted to remain in the area.

At approximately 9 A.M. Louis Natali, Esquire, who was representing those persons arrested at 7:15 A.M., engaged in a discussion concerning the persons arrested with Commissioner Joseph O'Neill, Philadelphia Police Commissioner, and Lt. Fencl. Commissioner O'Neill said that persons with signs were limited to the area designated for signs and that those in the area directly across from Independence Hall would be arrested. An agreement was then reached so that those arrested at 7:15 A.M. would be permitted to return to the south side of Independence Mall provided they agreed not to carry signs. Mr. Natali went to the Police Administration Building to relay this proposition to those held in custody. Only plaintiff Farber accepted this offer and he was immediately released. The others refused the conditional release.

Mr. Natali arrived back at the Independence Hall area at approximately 10:30 A.M. and informed Commissioner O'Neill of the results of his discussion. Immediately thereafter the police, at the direction of Commissioner O'Neill and in the presence of Lt. Fencl, arrested sixteen persons, all plaintiffs in this case,[4] who were peacefully standing behind police barricades in an area open to the public. They were all carrying signs against the war or against the re-election of President Nixon. These persons were told that they could remain if they gave up their signs or they could carry them on Market Street. When they refused they were all taken to the Police Administration Building where they were held. They were not informed of any charges against them.

In regard to the arrests on the morning of October 20, 1972, Lt. Fencl had received information from unidentified sources concerning possible "confrontation" or other actions of disruption by the demonstrators. The informants, however, did not name or describe the persons who would engage in these acts. Lt. Fencl did not learn or attempt to learn what was meant by "confrontation". There was no reason to believe that signs were a part of any plan for illegal activities.

The persons who were arrested during the morning of October 20, 1972, were

---

3. The persons arrested between approximately 7:15 and 7:30 A.M. included Plaintiffs Freeman, Driscoll, Pratt, Schiller, Day, Brennan, Ravitz, McVee, Seeber, Hardy, Doty, Bye, Avila, Campbell, Windle and Malone.

4. The persons arrested between 10:30 and 10:50 A.M. were Plaintiffs Puston, Buckalew, Halasa, Klotz, Haydt, Tuckerman, Smiler, Seaman, McHugh, Dickinson, Aldred, Kryszak, Palumbo, Abdoo. There was also a stipulation that Steven Clark, who is not a plaintiff, was arrested at this time.

kept in custody until 4:00 P.M., long after President Nixon and other government officials had left the Independence Hall area. They were effectively denied the opportunity to carry signs or distribute leaflets in Independence Mall during President Nixon's visit. Many of these persons were fingerprinted, searched, interrogated and photographed while in police custody. No contraband or weapons were discovered by police. All of these persons were released without any charges being pressed against them. They were kept in custody despite the issuance of the TRO which specifically covered the activities for which they had been arrested.

At 11:00 A.M. the Complaint and Motion for a Temporary Restraining Order were filed in this Court on behalf of the persons arrested at 7:15 A.M. This Court held an informal hearing in chambers at which Mr. Farber and Mr. Natali described the arrests and the terms of the conditional release offer. Murray Goldman, Esquire, Assistant City Solicitor, representing the defendants, expressed the opinion, based on discussions with Lt. Fencl, that these persons were arrested for being in a walkway which was to be used by visiting dignitaries and was not open to the public. At 12:40 P.M. we issued a TRO, a copy of which was immediately handed to Mr. Goldman.

A request to order the persons arrested to be released was refused. After the TRO was issued Mr. Natali called Lt. Margolis of the Philadelphia Police Department and informed him of the order's contents. He told Lt. Margolis that the persons arrested that morning at Independence Hall should be released. Lt. Margolis refused to release them on the ground that he was awaiting orders from superiors.

Plaintiff Gary Thomas, a member of Vietnam Veterans Against the War, went to Independence Mall at about 1:00 P.M. with a certified copy of the Court's TRO and a banner of his organization. He had been ordered to leave the Mall that morning because he had the banner under his jacket. At 1:00 P.M. he was refused entry to the Mall even after he read the Court's order to the officers on duty. Thomas identified the officers as Lt. Rich and Officers Hughes, Wimberly, Jones, O'Donnell, and unidentified officers with badge numbers 4288 and 8552. Thomas' companion, Patrick Rogers, was arrested as he attempted to enter the Mall after he returned the banner to Thomas.

Plaintiff Farber arrived at the Mall at 12:50 P.M. and observed that police were still refusing entry to the Mall of persons with signs even though he informed numerous police officers of the existence of the TRO. When he was not permitted to see Lt. Fencl he returned to the courthouse where he obtained certified copies of the order. Farber then returned to the Mall where he handed copies to Captain Lindsey and Lt. Rich of the Philadelphia Police Department, who were near the corner of Sixth and Chestnut Streets. These officers then conferred with Mr. Goldman who told them that they were not violating the TRO. They returned to the Mall entrance and refused to allow sign carriers into the area opened to the public on the Mall.

Plaintiff Jacqueline Ruttenberg attempted to enter the Mall with a sign at about 1:30 P.M. She had arrived around noon but had remained outside the Mall because she had heard the police were excluding persons with signs. When she tried to get into the Mall a police officer wearing an "E" button[5] refused her entrance and told her to give up her sign. She and others were still denied access with signs and leaflets after a copy of the TRO was read

---

5. There was testimony by Lt. Fencl which established that the men wearing little pins with black letter "E"s were members of the Philadelphia Police Department operating as plain clothesmen that day. These pins were distributed to the officers by the United States Secret Service. Other plainclothes officers were wearing small yellow and blue pins on their lapels.

and handed to the officers blocking the entrance. Captain Lindsay told them that no one's constitutional rights were being violated.

Plaintiff Linda Backiel, a legal worker, went to the Mall area when she learned that a TRO had been issued. Another person gave her a sign with an anti-war slogan. She heard Lt. Rich inform a person that he could enter the Mall as a private citizen but not with a sign or leaflets. While she watched others with signs being kept out of the Mall a policeman tore her sign from its stick. Among the officers she observed interfering with access to the Mall were Lt. Rich, Officers O'Donnell, Kiehn, Mitchell and badge numbers 9771 and 2752.

Plaintiff Robert Jannet arrived at the corner of Fifth and Chestnut Streets at about 1:15 P.M. with a sign protesting the war in Vietnam. He and a friend were told by a man wearing an "E" button that they could not stand there with their signs but would have to go to Sixth and Chestnut Streets. They were prevented from entering the Mall with their signs at three different locations by men wearing "E" buttons. Jannet was later refused access to the Mall by uniformed policemen after the order was read to them.

Plaintiff Dale Cunningham, a translator of technical materials, entered the Mall area at about 1:10 P.M. with a sign protesting the President's policies in Vietnam. When he held the sign up a man with an "E" button seized and crumpled the sign. Police officers in the area would not assist him in retrieving the sign. He was arrested and taken into custody when he began to take pictures of officers seizing signs despite the fact that Joseph Miller, a corporate executive active in the anti-war movement, informed the police of the TRO. Cunningham was searched, photographed, fingerprinted, denied access to a telephone and kept in custody for more than six hours. During his incarceration he was unable to do translation work for which he charges $50.00 per hour.

Two other plaintiffs, Alan Morrison and Robert Posusney, were arrested by police at the same time and in the same area as Cunningham. Morrison got on the shoulders of Posusney and others and began to address the crowd through a bull horn concerning the war in Vietnam and the actions of the police. They were held in custody for five hours and were released without any charges being made.

At approximately 1:00 P.M. Plaintiff Isaac Sletson, Executive Secretary of SANE, was stopped by a member of the Civil Disobedience Squad while walking down the west side of Sixth Street from Market to Chestnut Street with leaflets under his arm. The officer told him that he could go no further with the leaflets. When Sletson protested and attempted to go on he was arrested, searched and placed in a police car. He was released about fifteen minutes later.

Plaintiff William Hutton and a group of between twenty-five and fifty persons, many of whom were carrying signs, were stopped by police at approximately 1:15 P.M. as they walked in a procession east on Chestnut Street towards Sixth. They had previously been demonstrating at the area designated by the police for sign carriers at Fifth and Market Streets. After they were stopped they maintained a picket line where they were, between Sixth and Seventh Streets, for approximately fifteen minutes when they decided it was futile.

Plaintiff Vincent Klingler went to Independence Mall that day to demonstrate against the war in Vietnam. At approximately 1:20 P.M. he saw a fight break out between Jay Schwartz, another demonstrator, and an unidentified spectator. Several police officers intervened and began to take Schwartz from the area. Klingler ran alongside the officers carrying Schwartz. He screamed to the crowd that they should not permit the police to take Schwartz away. He yelled

at the police using derisive terms and obscenities. This took place in the vicinity of a crowd. He touched the arm of the other participant in the fight while that person was being held by the police. The police took Klingler into custody and held him for approximately five hours without charges.

Plaintiff Lawrence Manuel was denied access to the Mall when he arrived with some leaflets at 11:30 A.M. After he learned of the TRO, Manuel returned to the entrance at Sixth and Chestnut Streets and attempted to enter the Mall with a sign. He was rebuffed by six men wearing "E" buttons. He left but came back in a few minutes with other demonstrators. At that time Joseph Miller was speaking with Captain Lindsey and other officers concerning the TRO. Despite the notice of the Court's order, Manuel and the others were refused entrance with their signs, and Manuel was kept out even after he gave up his sign. When he challenged the authority of the officers blocking the steps he was taken away. He was kept in custody for six hours, fingerprinted, photographed and searched, and finally released at 8 P.M. without any charges entered against him.

The policy of the defendants on October 20, 1972 was to exclude all persons with signs and leaflets from the Mall area directly across from Independence Hall. The evidence demonstrates a practice of prohibition and not mere request as contended by defendants. This policy was in effect both before and after the issuance of the TRO. Neither Lt. Fencl nor Commissioner O'Neill made any attempt to alter this policy after receiving notice of the TRO.

There was no factual basis to justify any of these arrests as necessary to the security of the President or other dignitaries. The police had no information which specified which individuals who were arrested planned any kind of illegal action that day. They did know that many persons planned protests against the war and President Nixon's policies. Defendant Fencl, who claimed that the 10:30 arrests were made on the basis of reports by plaintiff Alan Hardy and undisclosed sources that persons would "confront" the President, had not sought to learn what was meant by the term "confront", which has many meanings both innocent and sinister. None of the information supported the conclusion that any of these plaintiffs would be involved in an illegal confrontation. There was no information provided to police concerning the possible use of signs in any illegal or threatening manner during the President's visit. The only information which Lt. Fencl had concerning any of the plaintiffs related only to prior activities and organizational affiliation.

The policy of the police to restrict signs to areas other than the Mall directly across from Independence Hall was disturbingly successful. There were practically no signs or leaflets in the Mall area between 11:00 A.M. and 2:00 P.M.[6] Signs finally did appear in appreciable numbers at approximately 2:00 P.M. as President Nixon was leaving the ceremony. These signs were for the most part paper leaflets, 8½ inches by 11 inches, which had been smuggled into the Mall area by Willard McKay and two of his friends under their outer clothing.

The persons who were arrested and those who were denied access to the Mall that day all considered it very important that they be there to demonstrate in a visible manner against policies they thought wrong. They believed that for their views to receive the most attention both from the President and other officials, and from the media, it was necessary to have signs in the area directly

6. We have discounted the testimony of defendants' witnesses who claimed to have seen numerous signs on the Mall between 11:00 A.M. and 1:00 P.M. The videotapes taken by the police show an almost complete absence of signs during that time period. The videotape showed a significant number of signs only at 2:00 P.M.

across from Independence Hall. This opportunity for legitimate protest was denied by the actions of defendants.

The testimony established that there was a very substantial number of policemen on duty that day. Lt. Fencl indicated he had forty-one men under his command. There were uniformed officers on horses the length of the block on Chestnut between Fifth and Sixth Streets. Many officers were in plainclothes wearing either the "E" buttons or the yellow and blue pins. There were teams of sharpshooters on several surrounding buildings. The Secret Service, of course, also provided a significant number of men. While no exact figures were produced, we must conclude that security was extensive and sufficient to deal with any confrontation planned by the groups in question.

## DISCUSSION

The TRO in this action was entered specifically to protect the rights of those persons who wished to demonstrate peacefully with signs in areas open to the public while President Nixon was in Philadelphia. It was issued in compliance with Fed.R.Civ.P. 65(b)[7] on the basis of a verified complaint and statements by Messrs. Farber and Natali which made it appear that the Philadelphia Police Department was engaged in an intentional attempt to deny access to the area solely on the basis that people were carrying signs. At that time we concluded that such a practice constituted a serious breach of the First Amend-

ment rights of the people involved. The TRO was necessary to prevent immediate and irreparable harm to such rights since President Nixon was to be in Philadelphia for only a short time.

The testimony produced at the hearings clearly established that the police indeed had a policy to exclude sign carriers from the south side of Independence Mall directly across from Independence Hall. Persons in this area would have the best opportunity to be seen by the President and the media. The policy of exclusion was not intended to protect the President and was not necessary for security. It was rather an attempt to limit visible dissent to an area where it would be inconspicuous and, thereby, ineffective.

Plaintiffs seek to have Commissioner O'Neill, Lt. Fencl and other specific police officers held in civil contempt of the TRO. These persons were all subject to the Court's order. The TRO was issued against Honorable Frank L. Rizzo,[8] Lt. Fencl, John Doe and Richard Roe. It was binding upon the named defendants and "their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them." Fed.R.Civ.P. 65(d). The persons who have been named in the contempt petition and hearing were all Philadelphia police officers and clearly within the class of persons enjoined.

■■■ Civil contempt is intended to enforce compliance with a court order or to compensate for losses or damages sus-

---

7. Fed.R.Civ.P. 65(b) provides in pertinent part:

(b) Temporary Restraining Order; Notice; Hearing; Duration. A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made

to give the notice and the reasons supporting his claim that notice should not be required. Every temporary restraining order granted without notice shall be indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; . . .

8. Plaintiffs in their Proposed Findings of Fact and Brief in Support of Petition for Civil Contempt admitted that there was a failure of proof as to Defendant Frank L. Rizzo, Mayor of the City of Philadelphia.

tained because of a violation of the order. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); United States v. United Mine Workers of America, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884 (1947). A person is liable for civil contempt when he violates the order, N. L. R. B. v. Crown Laundry and Dry Cleaners, Inc., 437 F.2d 290, 293 (5 Cir. 1971), with knowledge that the order has been issued, United States v. Hall, 472 F.2d 261 (5 Cir. 1972). Neither wilfulness nor formal service are necessary to a finding of civil contempt. Nor is it a defense to civil contempt that one received erroneous advice from counsel. In re Eskay, 122 F.2d 819, 822 n.17 (3 Cir. 1941), or a superior, Nelson v. Steiner, 279 F.2d 944 (7 Cir. 1960).

■ The facts established at the hearing demonstrate beyond any doubt that the Philadelphia Police Department engaged consciously and intentionally in conduct which was violative of the TRO. These established facts illuminate a course of conduct by which the police denied entrance to the Mall to anyone they encountered with a sign and harassed those in the Mall who had signs (Dale Cunningham) or opposed their actions vociferously (e. g. Alan Morrison and Robert Posusney). This conduct began before the TRO was signed and continued unabated after the police, both the officers stationed around the Mall and their superiors Commissioner O'Neill and Lt. Fencl, received notice of the Court's order.

■ ■ The plaintiffs in this action assert merely the right to peacefully demonstrate by means of inoffensive signs against certain governmental policies. The display of these signs was to take place in a public square, open to the public on that occasion. It is clear beyond doubt that the First and Fourteenth Amendments of the Constitution guarantee that persons may peacefully express or propagate ideas, either verbally or otherwise, in areas open to the public. Flower v. United States, 407 U. S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed. 2d 637 (1966); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Hague v. C. I. O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).[9] It is certainly beyond the unfettered discretion of the police to determine when such demonstration is allowed. See, Cox v. Louisiana, 379 U.S. 536, 557, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); Hague v. C. I. O., supra. By police department dictate this right was abrogated on that day although defendants did not establish that the presence of signs on Independence Mall would interfere with the rights or interests of anyone who came to the Mall or to Independence Hall. It was not a policy which was intended to prevent disruptive behavior but was applied

9. We do not understand defendants to differ with the principle that persons who carry signs or posters must be permitted into areas to which other members of the public are admitted. Defendants in this case, in fact, entered into a stipulation to that effect in Friends Peace Committee of the Philadelphia Yearly Meeting v. O'Neill, C.A. No. 72–992 (E.D.Pa., December 5, 1973) (Broderick, J.): "IT IS HEREBY STIPULATED AND AGREED that. the Defendants, their agents, servants, employees or those subject to their control and direction, in accordance with procedures which now exist, will not in any way segregate any persons from any place or any area to which the general public or spectators are permitted on the grounds that they are carrying signs, posters, placards or any other sign or symbol of affirmation, dissent, protest or views, . . . ."
It was further agreed that such stipulation did not interfere with the right of the police to erect necessary barricades to limit the access of all members of the public to fulfill a valid police function or to prevent entrance to areas private in nature.

indiscriminately against those who wished to exercise their First Amendment rights by the display of anti-war signs in an area open to the public.

The plaintiffs in this case may be conveniently divided into two distinct groups. The first group consists of those persons who were arrested with signs at 7:15 and 10:30 A.M. while in areas open to the public in Independence Mall. They were not released after the Court issued the TRO. The remaining plaintiffs are those who were arrested or were prevented from entering the Mall after the TRO was issued. Both groups contend that the actions of defendants towards them after the TRO was entered constituted a violation of that order.

The refusal of police officials and officers to permit persons with signs into Independence Mall after the TRO was read or shown to them was clearly a violation of the court order. It was a wilful continuation of the policy specifically prohibited by the TRO. This blatant disregard for the court order was shown in the cases of plaintiffs Gary Thomas, Jacqueline Ruttenberg, Linda Backiel, Robert Jannet, Isaac Sletson, Lawrence Manuel and Dale Cunningham. In respect to these plaintiffs the police officers were clearly in contempt.

Several other plaintiffs who base their claims on police actions after the TRO was issued are in a somewhat less clear position. We conclude, however, that in these instances also the actions of the police contravened the Court's order. Plaintiff Hutton was part of a group which attempted to march to Independence Mall with signs after the TRO was in effect. The policies of defendants towards those with signs leads us to the conclusion that Hutton and the others were stopped from proceeding because many of them had signs.

■ ■ The arrests of plaintiffs Alan Morrison and Robert Posusney were completely unrelated to the possession of signs or leaflets. They were, however, clearly related to the exercise of First Amendment rights which were mentioned in the order. We realize that the government has the authority to make reasonable regulations concerning the manner in which persons express themselves. See, Saia v. New York, supra; Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). In this instance, however, there has been no showing that the bullhorn used by Morrison was beyond a reasonable range. Nor do we believe that isolated threats of those close by justified the arrest since there was no reason to believe the situation was one which the large number of police in the area could not handle. See, Edwards v. South Carolina, supra, 372 U.S. at 236, 83 S.Ct. 680. Rather, we believe that the police interfered with the expression of Morrison and Posusney for the same policy reasons they prevented signs from coming into the Mall.

■ The last plaintiff seeking recovery for contempt is Vincent Klingler, who was arrested when he attempted to aid Jay Schwartz. We do not find that the record established sufficiently that the police action toward Klingler was aimed at suppressing his First Amendment rights. Klingler was screaming abuse at officers and urging on the bystanders to interfere. This is not speech protected by the First Amendment. See, Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

■ The persons arrested in the morning of October 20, 1972 present a different problem.[10] They were arrest-

10. The police contention that these persons, who were held in cells for up to nine hours, fingerprinted and photographed, were not arrested and therefore not protected by the probable cause requirements of the Fourth Amendment is ludicrous. The detention of these persons over such a period was clearly a "seizure" within the Fourth Amendment, subject to the protections of that

ed before the order was issued and, obviously, their arrests were not in violation of it. Plaintiffs contend, however, that once the TRO was issued the police had the responsibility to release them.

 The arrests in the morning were made because persons with signs would not move from the south side of the Mall directly across from Independence Hall. This area was not a security area and it was open to the public. The police did not have probable cause to suspect that any, let alone all, of the persons taken into custody presented a serious "security risk".[11] Rather, the arrests were made in an attempt to prevent these persons from demonstrating in a visible manner and in a conspicuous place their dissent from the policies of President Nixon.

The TRO was issued to prevent exactly this type of suppression. The persons being held in custody were arrested for actions clearly within the protection of the order. When the order was handed down, the police were aware of the true reasons for which they were being held. The continued confinement denied to these plaintiffs the benefit of the order handed down in their name. We believe that the police officials, aware of the reasons for which they were being held

and aware that the Court's order protected such activity, had the responsibility of releasing these persons and permitting them to exercise their rights including the carrying of signs in Independence Mall. The actions of the police, however, denied them the opportunity.

Defendants argue that they should not be held in contempt for failure to release the persons arrested in the morning because the Court specifically eliminated such a provision from the proposed TRO submitted to it by plaintiffs. This was done out of a concern for the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). At that time we did not have what we considered sufficient evidence to interfere with a state action which might well have resulted in criminal proceedings. At this time, however, we do have sufficient evidence that these arrests were made for no legitimate purpose and that defendants never seriously contemplated bringing criminal proceedings against them. The police, however, were always in possession of this information. They knew that these arrests were made to prevent these persons from demonstrating with their signs. To continue this detention was to continue the deni-

---

amendment. *See,* Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This is sufficient for our purpose.

11. We reject completely defendants' contention that its actions were justified by the past activities of some plaintiffs at demonstrations and by the uncorroborated reports of unidentified informants. The term "security risk" is not a talisman by which constitutional limitations are erased and police are given a free hand. *See,* United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). The actions of plaintiffs at prior demonstrations may not be used to deprive them of the opportunity to exercise their First Amendment rights. The police cannot be given the unfettered right to suppress demonstrations because they consider them risky from prior experience. *See,* Kunz v. New York, 340 U.S. 290, 294–295, 71 S.Ct. 312, 95 L.Ed. 280

(1951); *see also,* New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Youngstown Sheet and Tube v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). There was a very substantial amount of police protection available to guard against any organized action which might be taken. *See,* Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). The defendants did not attempt to get a judicial authorization for the detention of plaintiffs, although several hours were available to them. *See,* Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The information on which they claimed to rely did not satisfy the standards established by the Supreme Court in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), to establish that illegal activities were about to take place.

al, which violated the TRO once defendants received notice.

 Plaintiffs seek damages from defendants for the deprivation of their First Amendment rights. These damages would be compensatory for the damages caused by the violations. *See,* United States v. United Mine Workers, *supra.* Courts may award compensatory damages to plaintiffs who are deprived of constitutional rights. *See e. g.,* Basista v. Weir, 340 F.2d 74 (3 Cir. 1965); Donovan v. Reinbold, 433 F.2d 738 (9 Cir. 1970); Sexton v. Gibbs, 327 F. Supp. 134 (N.D.Tex.1970). The value of such rights, while difficult of assessment, must be considered great. Cortright v. Resor, 325 F.Supp. 797, 810 (E.D.N.Y.1971); *see,* Spock v. David, 469 F.2d 1047, 1053 (3 Cir. 1972). We also agree with plaintiffs that they should be awarded reasonable attorneys fees and costs. Crandall v. Conole, 230 F.Supp. 705, 715–716 (E.D.Pa.1964); Lance v. Plummer, 353 F.2d 585, 592 (5 Cir. 1965); Nelson v. Steiner, 279 F.2d 944, 948 (7 Cir. 1960).

We reject defendants' contention that Lt. Fencl and Commissioner O'Neill cannot be held liable. The facts established at the hearing demonstrated that Lt. Fencl and Commissioner O'Neill were aware of and directed the exclusion of persons with signs from the Mall area. When they were informed of the Court order they admittedly did nothing to change the policies in effect that day. Such actions or omissions on their parts make them liable for violations of the injunction which resulted from their orders or failure to take action. Via v. Cliff, 470 F.2d 271 (3 Cir. 1972). Captain Lindsey, Lt. Rich, Sgt. Carducci and the other police officers are liable to various individuals whom they personally injured.

Although we have found defendants in contempt of our order and liable for compensatory damages, we shall not impose damages at this time. There is currently a civil action in this same case pending before us. We shall await the outcome of that action before imposing damages.

We consider this case a most serious one. It has brought before the Court a contempt for the law by those officials charged with maintenance of the law. Defendants not only violated the First and Fourth Amendment rights of plaintiffs and others, but also they continued such actions in the face of a court injunction. While we are mindful of the difficulties with which policemen are faced in crowd situations, and this nation's tragic recent past, these concerns cannot be used as a smokescreen behind which government is permitted to suppress peaceful free expression. That is what defendants attempted and for that we must censure them.

Plaintiffs shall submit a proposed order in conformance with this memorandum within ten (10) days.

It is so ordered.