**Nancy MANFREDONIA and William Baird, Plaintiffs,**

v.

**John L. BARRY, Suffolk County Commissioner of Police, et al., Defendants.**

No. 71 C 1229.

United States District Court, E. D. New York.

Sept. 25, 1975.

---

3. P.L. 93–66 and P.L. 93–233.

Burt Neuborne, American Civil Liberties Union, New York City, for plaintiff Nancy Manfredonia.

Jerome Seidel, Brooklyn, N. Y., for plaintiff William Baird.

Curtis, Hart & Zaklukiewicz, Merrick, N. Y., by Edward J. Hart for defendants (Allen R. Morganstern, Mineola, N. Y., of counsel).

MEMORANDUM
OF
DECISION

NEAHER, District Judge.

In this action under 42 U.S.C. § 1983, plaintiffs sued for monetary damages and equitable relief to redress violations of their civil rights by the defendant Suffolk County officials and police officers, whom they alleged arrested and jailed them without probable cause and attempted to prosecute them for exercising rights of free speech. Equitable relief having become moot,[1] the case was tried by the court without a jury on the issues of liability and damages. The facts and discussion which follow constitute the court's findings of fact and conclusions of law pursuant to Rule 52, F. R.Civ.P.

The evidence at trial established the following facts without material contradiction. On the evening of August 6, 1971, plaintiff William Baird, a well-known speaker on population control, was scheduled to deliver a lecture in Huntington, Long Island, in a building known as the People's Town Hall ("PTH"). The lecture was jointly sponsored by the Huntington Women's Liberation and PTH, which then served as a headquarters for workers in the Methodist Volunteer Service affiliated with the Methodist Church. At least a week prior to the lecture notices had been sent to other women's liberation groups in Suffolk County and posters were displayed in local stores indicating that Mr. Baird's lecture would deal with the subject of birth control and abortion.

The posters were observed by Mrs. Lucille Buffalino, a Huntington resident and leader in groups strongly opposed to abortion. At her direction, one of her volunteer workers called the Huntington Town Supervisor's office and apparently complained that "juveniles" would attend the Baird lecture and that "contraceptive devices would be dispensed" (Def. Exh. T). That "message" was relayed to the Suffolk County Police Precinct in the Huntington area and triggered the police action which gave rise to this suit.

On August 6, when Mr. Baird appeared about 8:45 P.M. to give his lecture, an audience variously estimated at between 60 and 90 people had crowded into PTH to hear him. Nearly all were women, two or three of whom had small children with them. PTH, a former private dwelling, was not equipped to provide seating for all and a portion of the audience was either standing or seated on the floor. During the lecture a number of "teenagers" were observed entering and exiting at various times and a group of them were seated on a wall outside the building. Also present, unknown to those in attendance, were two plainclothes Suffolk County police officers, the defendants John Hall and Fred Bruns. They were there in response to the "message" initiated by Mrs. Buffalino.

The lecture delivered by plaintiff Baird—and heard by the defendant police officers—was one he had given hundreds of times over the past decade at high schools, colleges, universities, churches, temples, synagogues and to numerous other organizations and public gatherings throughout the country.[2] Its essential message stressed the right of

---

1. See *Farkas v. Barry*, 335 F.Supp. 681 (E. D.N.Y.1972, three-judge court).

2. Baird, father of four children, was well qualified to give such a lecture. Holder of a B.S. degree in chemistry, he left medical school after one year to become a clinical director for a large manufacturer of a well-known contraceptive substance. In that capacity he worked closely with hospitals and physicians in clinical research on further development of the drug. Since 1965, as a self-described "social reformer", he has been lecturing and acting as founder-director of a birth control-abortion clinic in Hempstead, Long Island, staffed by volunteer physicians who offer free consultation and advice to women seeking counsel on such matters. This is not the first time he has been arrested on account of his lecturing activities. See *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L.Ed.2d 349 (1972).

women to control their procreative faculties but warned of the risks of ignorant reliance upon various methods and devices commonly used to avoid conception, the serious hazards of self-abortion and implements often used for that purpose, and the need for competent medical advice. The message was made more graphic by the use of a display panel Baird devised (Def. Exhs. K, K–1). This was a board on one side of which were affixed specimens of the various contraceptive devices referred to in the lecture, and on the other side were attached common implements which have been used for self-abortion, surrounding a prominent skull and cross-bones painted on the panel.

Baird, after completing his lecture, invited questions from the audience. Just as the question and answer period was beginning, several uniformed policemen summoned by the surveilling plainclothesmen arrived at PTH. Their appearance and actions created a state of confusion, during which any "juveniles" —if indeed any were present—disappeared. The police operation resulted in only two arrests, which were made by the defendant officers Hall and Bruns. Those arrested were plaintiff Baird and plaintiff Nancy Manfredonia, who had attended the lecture with her 14-month old baby daughter.

Mrs. Manfredonia and her husband are residents of Suffolk County and her attendance at the Baird lecture was prompted by a notice she received through the mail from a local women's group of which she is a member. She is a university graduate, married, and now the mother of two children. At the time of her arrest she was 28 years of age. Prior to the lecture she had never met Baird and had no contact with him apart from the proceedings arising out of the incident herein. The Manfredonias had their baby daughter with them that evening because they were unable to obtain the services of a baby sitter. About 9:00 P.M., after completing some shopping, they proceeded to PTH, where Mrs. Manfredonia went in to hear the lecture and her husband left with the child to carry out another errand. He later returned to PTH, where Mrs. Manfredonia asked him to come in with the baby and wait for a few minutes to enable her to hear the question and answer session about to begin.

After the police interruption occurred, she was escorted outside and taken with her husband and baby in a police car to police precinct headquarters. Plaintiff Baird was also escorted out of PTH in police custody and taken to the precinct. There, both plaintiffs were informed they would be charged with endangering the welfare of a child in violation of New York Penal Law § 260.10.[3] The "child" was Mrs. Manfredonia's baby. Both were then processed in the usual manner by being fingerprinted, photographed, handcuffed and taken to a town jail for confinement overnight pending arraignment in court. This was completed well after midnight, at which time Mr. Manfredonia was permitted to return home with the baby. Mrs. Manfredonia spent the night in a

---

3. "§ 260.10. Endangering the welfare of a child
 "A person is guilty of endangering the welfare of a child when:
 "1. He knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a male child less than sixteen years old or a female child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his life or health; or
 "2. Being a parent, guardian or other person legally charged with the care or custody of a child less than eighteen years old, he fails or refuses to exercise reasonable diligence in the control of such child to prevent him from becoming an 'abused child,' a 'neglected child,' a 'juvenile delinquent' or a 'person in need of supervision,' as those terms are defined in articles ten and seven of the family court act.
 "Endangering the welfare of a child is a class A misdemeanor.
 "As amended L.1970, c. 389, eff. Sept. 1, 1970; L.1970, c. 962, § 14, eff. May 1, 1970."

bare cell with only a wooden slab, lacking blankets, mattress or pillow, for purposes of rest. Her sandals and glasses were taken from her and not returned until she entered the courtroom the next morning. Mr. Baird was subjected to similar treatment.

On August 7, 1971, the plaintiffs were arraigned in the Suffolk County District Court at Hauppauge, Long Island. There they were charged in formal misdemeanor complaints with violating § 260.10 of the New York Penal Law, n. 3 *supra*. Plaintiff Manfredonia was charged by defendant Hall with violating subdivision 2 of § 260.10 for having taken her infant daughter "to a lecture concerning birth control devices at which lecture said devices were exhibited in there [*sic*] use." Plaintiff Baird was charged by defendant Bruns under subdivision 1 of the statute for having "exposed" plaintiff Manfredonia's infant "to a lecture concerning birth control devices and did exhibit said devices with instructions for their use." Pl. Exh. 1. The police defendants having refused to dismiss the charges, both plaintiffs were released pending trial, for which a later date was set.

Prior to that date, however, the charges against both plaintiffs were dismissed in open court on motion of the District Attorney of Suffolk County. On this trial the parties stipulated that affidavits previously filed by the District Attorney could be received in evidence in lieu of his testimony. Pl. Exhs. 7, 8. In brief, the District Attorney averred that he was unaware of the arrests, did not authorize them, and would have declined to prosecute the charges because it was his opinion that Penal Law § 260.10 "is not applicable to a parent bringing a minor child to attend a lecture on birth control." See also *Farkas v. Barry*, 335 F.Supp. 681 (E.D.N.Y.1972, three-judge court).

## 1. *Liability*

The evidence in this case indisputably establishes that at the time the defendant police officers undertook the actions complained of, both plaintiffs were doing nothing more than exercising rights firmly secured by the United States Constitution. Plaintiff Baird was simply exercising his First Amendment right of free speech—to communicate with those who wanted to hear what he had to say, however unpopular his ideas might be with other members of the community. His so-called "demonstration board", Def. Exhs. K, K–1, which the defendant police officers unsuccessfully attempted to make the basis of their charges, was but an adjunct to illustrate points made in his lecture. Both Hall and Bruns conceded that no illegal items were displayed and no contraceptive devices were dispensed.

Plaintiff Manfredonia was similarly exercising her First Amendment rights, shared by the other adults present, mostly women, to listen to Baird's lecture. Both plaintiffs were also exercising their right to peaceably assemble at the PTH pursuant to the invitation of the sponsoring women's organization. Mrs. Manfredonia, moreover, was clearly exercising her parental right under the Ninth Amendment to have her own child with her regardless of its age.

There was no credible evidence of any disorderly conduct or other breach of the peace calling for police action until the police themselves arrived at PTH in force. Their intrusion upon the scene effectively disrupted the question and answer portion of the lecture and deprived these plaintiffs (and others) of constitutional rights. The subsequent arrest, charging and police processing of these plaintiffs were further deprivations of their civil rights under color of law, for they were made without a warrant, clearly were without probable cause and, in the court's view of the evidence, not excusable on grounds of good faith.

The federal Civil Rights Act, 42 U.S.C. § 1983, "imposes on the states and their agents certain obligations and

responsibilities. A police officer has the duty not to ratify and effectuate a heckler's veto nor may he join . . . [those] intent on suppressing ideas." *Glasson v. City of Louisville*, 518 F.2d 899, 906 (6 Cir., 1975). Nor may a police officer safely rely without investigation upon some anonymous telephone caller's complaint as a basis for arresting citizens. "Instead, he must take reasonable action to protect . . . persons exercising their constitutional rights." *Id.*

■ The defendants Hall and Bruns defend against liability on the grounds (1) that the dismissal of charges against the plaintiffs does not mean the police officers did not have reasonable grounds to believe offenses had been committed at the time of their arrest; and (2) in any event, the police officers acted in good faith in believing it was proper to arrest and charge the plaintiffs under the circumstances. Such a defense, if established by a preponderance of the evidence, would bar liability here. *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). As the Supreme Court pointed out in *Pierson*, if the trier of the fact "found that the officers reasonably believed in good faith that the arrest was constitutional, then a verdict for the officers would follow, even though the arrest was in fact unconstitutional." *Id.*

The meaning of "good faith" has been explained in this Circuit in the following terms:

"The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable."

*Bivens v. Six Unknown Agents of Fed. Bur. of Narcotics*, 456 F.2d 1339, 1348 (2 Cir. 1972). More recently, in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court, in discussing the liability of a school board member under § 1983, agreed that "the appropriate standard necessarily contains elements of both" objective and subjective good faith. But the Court also made clear that mere declarations of good intention, will not satisfy the immunity standard. As it pointed out, 95 S.Ct. at 1000,

"The official must himself be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice."

In further explanation, the Court added, *id.* at 1001,

"A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation *or with such disregard of the student's clearly established constitutional rights* that his action cannot reasonably be characterized as being in good faith." (Emphasis supplied.)

What is the state of the evidence on the good faith issue here? The defendant police officers testified they acted honestly in the belief that Baird's comments about the contraceptive and other devices on his demonstration board made in the presence of "teenagers" observed in the audience endangered their physical, mental and moral welfare in violation of Penal Law § 260.10, n. 3, *supra*. This, of course, would not justify the arrest of Mrs. Manfredonia, nor of Mr. Baird. She did no lecturing and her baby daughter could not possibly have comprehended what was said. There is not a scintilla of evidence that Baird was addressing his remarks to "teenagers" or was in any way responsible for their presence.

■ The defendants' explanation for the arrests was even less satisfying, especially since it travelled in two differ-

ent directions. First, it was claimed that Mrs. Manfredonia permitted her baby to sit or crawl between her legs as she stood listening to the lecture and thus *physically* endangered her child in violation of Penal Law § 260.10. Confronted with the formal misdemeanor complaints, which were virtual counterparts for each plaintiff, Pl. Exh. 1, the defendants claimed inadvertent error due to the confusion in the precinct following the arrests. Secondly, it was claimed that Mrs. Manfredonia was arrested when she asked to be arrested after refusing a police invitation to be a witness against Baird. Mrs. Manfredonia flatly denied such a request, but it hardly requires statement that a police officer is not warranted in making an arrest simply because a person requests it.

The evidence offered by the defendant police officers wholly fails to satisfy their burden of showing that the arrest of these plaintiffs was made in good faith. Indeed the evidence to the contrary is overwhelming. Officers Hall and Bruns were seasoned policemen, not rookies. Hall had been a policeman for 13 years as of 1971, including six years in the New York City Police Department. Bruns had been a Suffolk County policeman for over 16 years. When they reported for duty at 5:00 P.M. on August 6, 1971, Bruns received the internal memorandum which spelled out their assignment. Def. Exh. T. It called for an "Investigation" as follows:

> "Information has been received from an anonymous complainant that William Baird, who lectures on birth control, is planning to address a group of juveniles that will be assembled at the Peoples Town Hall, 480 New York Ave., Huntington at 2000 hours this date.

> "The complainant stated that information she received led her to believe that contraceptive devices would be dispensed to those in attendance this evening."

Bruns testified that his superior officer told him to read a section of the Penal Law that had to do with the endangerment of the welfare of a child. That is apparently all the defendants did in the three and a half hours that elapsed prior to the Baird lecture.

One would think that ordinary prudence and common sense would have prompted the officers to visit PTH in advance of the lecture and ascertain the true state of facts, if their interest was really the protection of juveniles. They knew from past experience that young people congregated there. Yet they made no attempt to ascertain who was sponsoring the lecture or to inquire at PTH what steps might be taken to assure that unaccompanied minors would not be admitted without evidence of parental permission. Indeed, they did not even question "juveniles" they saw outside the building before or during the lecture as to age or parental permission. And during the lecture itself they could see that the "anonymous complainant" had misrepresented the facts. No contraceptives were "dispensed" to anyone and the lecture was directed to an audience composed mostly of adult women.

The defendant officers knew that what was going on was a lecture, nothing more. There was no emergency and not the slightest indication of disorderly or immoral conduct calling for a police intrusion. Under the circumstances, the court finds that defendants Hall and Bruns acted "with such disregard of the [plaintiffs'] clearly established constitutional rights that [their] action cannot reasonably be characterized as being in good faith." *Wood v. Strickland, supra.* They are therefore liable for such damages as their wrongful actions caused.

Two other named defendants remain to be considered. The parties have stipulated to discontinue the action against the defendant H. Lee Dennison, the former County Executive. The defendant John L. Barry, former police commissioner, moved at trial for dismissal

on the merits for failure to prove a prima facie case against him. The plaintiffs, while resisting dismissal, concede that Barry neither ordered their arrest nor participated in its execution. Plaintiffs argue, however, that he took no action to undo the arrests and therefore acquiesced in and ratified them.

The difficulty with plaintiffs' position is the total absence of evidence implicating Barry personally in any way. This Circuit has rejected the imposition of liability upon an imputed or vicarious basis in § 1983 cases. *See Lathan v. Oswald*, 359 F.Supp. 85, 89 (S.D.N.Y.1973), and cases cited therein. *Wright v. McMann*, 460 F.2d 126 (2 Cir. 1972), upon which plaintiffs rely, is not to the contrary because there the prison superintendent was found to have had actual or constructive knowledge of the existing inhumane conditions which gave rise to the deprivation of a prisoner's civil rights. No evidence exists here which permits any inference that Barry had constructive knowledge or responsibility for this incident. Nor does this case present the systematic pattern of conduct by police which prompted the court to sustain a § 1983 complaint against a police commissioner in *Build of Buffalo, Inc. v. Sedita*, 441 F.2d 284 (2 Cir. 1971). The action as against defendant Barry must therefore be dismissed.

### 2. Damages

When a plaintiff in a § 1983 action has established liability for a deprivation of civil rights, an award of compensatory or punitive damages, or both, is necessarily left to the discretion of the trier of the fact in the absence of out-of-pocket or other loss or injury. *Stolberg v. Members of Board of Trustees, etc.*, 474 F.2d 485, 489 (2 Cir. 1973). What is plainly called for is the exercise of a sound discretion, *i. e.*, based upon proof of supportive facts and circumstances. But there must also be recognition that "a deprivation of a constitutional right is significantly different from and more serious than a violation of a state right . . . even though the same act may constitute both a state tort and the deprivation of a constitutional right." *Monroe v. Pape*, 365 U.S. 167, 196, 81 S.Ct. 473, 488, 5 L.Ed.2d 492 (1961) (Harlan, J. concurring). The determination of an award is therefore guided by the federal common law of damages. *Sullivan v. Little Hunting Park*, 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Basista v. Weir*, 340 F.2d 74, 87 (3 Cir. 1965).

Each plaintiff in this action originally sought compensatory damages of $5,000 and punitive damages of $100,000. At the conclusion of the trial they jointly moved to increase their demand for compensatory damages to $25,000 each. Plaintiffs have brought to the court's attention only one civil rights case even approaching the increased amounts they seek. In that case, *Gaston v. Gibson*, 328 F.Supp. 3 (E.D.Tenn.1969), a jury award of $10,000 in compensatory damages and $30,000 in punitive damages was held not excessive because of "shocking" conduct on the part of sheriff's deputies in arresting the juvenile plaintiff in total disregard of his due process rights and so brutally abusing him as to cause a lasting head injury. Nothing approaching such conduct occurred here.

Neither plaintiff in this action has claimed any resulting out-of-pocket loss, diminution of earnings or physical injury of such consequence as to warrant the greatly increased compensation they demand. Such familiar elements of damage, however, need not be shown in order to justify a reasonably substantial compensatory award in a civil rights case. *Basista v. Weir, supra; Wayne v. Venable*, 260 F. 64, 66 (8 Cir. 1919). It is sufficient to establish, as plaintiffs have succeeded in doing here, a deprivation of constitutional rights through misuse of official power.

The right to be free of illegal arrests and imprisonments is one of our most precious constitutional rights. Of equal

if not greater worth is the right to speak freely to fellow citizens and to assemble peaceably for that purpose. To assign an appropriate monetary value to the denial of rights so highly prized, however, it not a simple task, if it is not to be purely arbitrary. Damage awards in similar wrongful arrest cases cited by the parties, and noted in the margin,[4] display a widely varying range not always attributable to differing facts and circumstances. In general, they support defendants' contention that compensatory awards have not exceeded $5,000 and in many instances have been considerably less. They also reveal that although punitive damages have been allowed with some frequency, they have been relatively modest in amount except for the jury award in *Gaston v. Gibson, supra.*

In this case, as in *Lykken v. Vavreck,* n. 4 *supra,* it is clear that plaintiff Manfredonia suffered mental and emotional distress and that both plaintiffs were subjected to public notoriety and embarrassment because of defendants' actions. The seriousness of those actions cannot be excused or mitigated as a "merely trivial" exercise of police authority, as defendants seem to suggest.[5] There was nothing trivial about the consequences of the unlawful arrests, which led to fingerprinting, photographing, an uncomfortable overnight stay in jail, continued court proceedings when the police refused to dismiss the charges, arrest records stigmatizing both plaintiffs with an odious offense even though the charge was later dismissed, and extensive newspaper and media notoriety.

Moreover, whether this young mother went "voluntarily" with the police, or, as she testified, felt under compulsion to go, only one reason is apparent for her actual arrest on the ground of endangering the moral welfare of her infant—impermissible police coercion to be a witness against plaintiff Baird. This is all too clear from defendant Bruns' own testimony,which reveals a not unfamiliar police technique of worrying her by repeated statements that she would be charged with "physically" endangering her child if she did not cooperate.

The further defense contention that plaintiffs brought the public notoriety down on their own heads is contrary to the evidence. Defendants overlook the fact that a local correspondent for the Long Island Press, a large daily newspaper, was already in the audience covering the Baird lecture when the police intruded and arrested him. That reporter had a "scoop" unfold before her eyes. To suggest that new media interest in such a story was prompted by a later telephone call Baird's secretary made is incredible.

Plaintiff Baird is admittedly a controversial public figure. This has prompted defendants to contend that the conse-

---

**4.** *Antelope v. George,* 211 F.Supp. 657 (D. Idaho, N.D.1962) ($500 damages for unlawful arrest and detention); *Rhoads v. Horvat,* 270 F.Supp. 307 (D.Colo.1967) ($5,000 compensatory and $2,500 punitive damages for arrest of college professor without warrant and 30–45 minutes in jail); *Sexton v. Gibbs,* 327 F.Supp. 134 (N.D.Texas 1970), *aff'd,* 446 F.2d 904 (5 Cir. 1971), *cert. denied,* 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972) ($750 damages for unlawful arrest and search of motorist's car); *Magnett v. Pelletier,* 360 F.Supp. 902 (D.Mass.1973) ($500 damages for police unlawful entry into apartment during municipal disturbance); *Lykken v. Vavreck,* 366 F.Supp. 585 (D. Minn.1973) ($1,000 and $500 compensatory and $2,500 punitive damages for warrantless police "raid" on fund-raising party in private home); *Farber v. Rizzo,* 363 F.Supp. 386 (E.D.Pa.1973) ($750 and $500 compensatory damages for unlawful arrest and detention of sidewalk protesters for 2 to 9 hours); *Boscarino v. Nelson,* 377 F.Supp. 1308 (E. D.Wis.1974) ($1,263.20 compensatory damages for arrest of burglar suspect without probable cause); *Tatum v. Morton,* 386 F. Supp. 1308 (D.D.C.1974) ($100 damages per plaintiff for unlawful arrest of prayer vigil group outside White House and 3 to 4 hours jail detention); *Roberts v. Wilson,* Civ. Action No. 1436–71 (D.D.C.1971), *aff'd,* 160 U.S.App.D.C. 149, 489 F.2d 1273 (1974) ($3,000 compensatory and $500 punitive damages for unlawful arrest during mass street demonstrations).

**5.** Defendants' Trial Memorandum at 50.

quent publicity was welcome to Baird and not unwelcome to Mrs. Manfredonia who was then a third party candidate for Town office. The difficulty with such a contention is the uncontradicted evidence that the characterizations "child molester" and "morals charge" appeared frequently in the publicity and that both plaintiffs received threatening and scurrilous letters and telephone calls for some time after the event. Mrs. Manfredonia also became the target of hostile comments from her neighbors and even relatives.

Defendants offered no explanation as to just how such notoriety was of benefit to the plaintiffs and the court is unable to perceive any. Indeed, Baird and his wife testified without credible contradiction that the notoriety and threatening letters and telephone calls became so oppressive as to prompt them to vacate their own home in Valley Stream, Long Island, and transfer their children to a school in Massachusetts where they still resided at time of trial. No claim is made, however, for any recompense on that account.

 The defendant police officers are not responsible, of course, for what the news media wrote or broadcast or for the crank letters or telephone calls plaintiff received. But they are responsible for the natural and normal consequences of their acts when they failed to act as reasonably prudent men by making these unlawful arrests. Having recklessly deprived these plaintiffs of important constitutional rights— which the defendants should clearly have recognized and protected—and wrongfully subjected them to mental and emotional distress of being charged as criminal offenders and to the public humiliation which inevitably followed, the defendants must make compensation. Accordingly, the court awards compensatory damages of $3,500 to each of the plaintiffs against defendants Hall and Bruns jointly and severally.

There remains the question of punitive damages. Plaintiffs urge that they be imposed, pointing to Mr. Justice Brennan's separate opinion in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 232–233, 90 S.Ct 1598, 1642, 26 L.Ed.2d 142 (1970), wherein it is stated that a plaintiff in a § 1983 action

> "need not show that the defendant specifically intended to deprive him of a recognized federal right, it is sufficient . . . to show that the defendant acted . . . with reckless disregard of whether he was violating such a right."

Punitive damages have been awarded against police officers for unlawfully entering and searching an apartment in the presence of the occupants, even though they "acted like gentlemen." *Caperci v. Huntoon*, 397 F.2d 799 (1 Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968).

Plaintiffs do not complain of any serious mistreatment at the hands of defendants. Their charge is directed to the entire operation planned and carried out by these officers. Although the thrust of the latter's defense was their asserted motive to protect juveniles or "teenagers" from moral contamination, in all the time they were at PTH they did not obtain the identification of a *single* youngster, even though they claimed to have seen many there.

Detective Donohue, who assisted the defendants at PTH and testified as a defense witness, admitted that defendant Bruns told him plaintiff Baird would be speaking at PTH and to be there at 8:30 "to hear him talk." The inference is inescapable that the "teenagers" were but a backdrop for the real target— plaintiff Baird and his controversial ideas. As defendant Bruns eloquently acknowledged on cross-examination, "The substance that he discussed, I felt, in my opinion, was not in the best interests of the community or the individuals

that were in attendance, namely the youths." [6]

 As in *Lykken v. Vavreck, supra,* "the evidence compels the conclusion that the defendants here acted in bad faith, for an improper motive, and in gross disregard for the constitutional rights of the plaintiffs." 366 F.Supp. at 596. Police officers are not empowered to censor speech or speakers, however controversial or unpopular they may be. To deter such conduct an award of punitive damages is appropriate. The court awards an additional $500 to each of the plaintiffs as punitive damages imposed on each defendant.

Judgment shall be entered accordingly.[7]

So ordered.

---

**6.** Trial Minutes at 1084–85.

**7.** The judgment herein adjudicates only plaintiffs' claims under § 1983. The court declines to exercise pendent jurisdiction over claims asserted in a State court action which, it is informed, involves additional defendants who have had no opportunity to participate in this trial. See Defendants' Trial Memorandum at 14.

Also, in view of plaintiffs' indication of an intention to apply for counsel fees in this case, their attention is called to *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), which would seem to foreclose such an allowance.